IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | Case No. 17-17465 KHT |
| ) | |
| BADLANDS ENERGY, INC., et al., ) | Chapter 11 |
| ) | |
| Debtor. ) | Jointly Administered Under |
| ) | **Case No. 17-17465 KHT** |
| ) | |
| MONARCH MIDSTREAM, LLC, ) | |
| f/k/a MONARCH NATURAL GAS, LLC, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Adversary No. 17-01429 KHT |
| ) | |
| BADLANDS PRODUCTION COMPANY, ) | |
| f/k/a GASCO PRODUCTION COMPANY; ) | |
| BADLANDS ENERGY INC., f/k/a GASCO ) | |
| ENERGY, INC.;  and WAPITI UTAH, LLC ) | |
| f/k/a WAPITI NEWCO, LLC, ) | |
| ) | |
| Defendants ) | |

**WAPITI UTAH, LLC'S ANSWER AND AFFIRMATIVE DEFENSES
TO MONARCH MIDSTREAM, LLC'S COMPLAINT
FOR DECLARATORY JUDGMENT**

Wapiti Utah, LLC f/k/a/ Wapiti Newco ("Utah"), by and through its undersigned counsel, hereby files this Answer and Affirmative Defenses ("Answer") to the *Complaint for Declaratory Judgement and Other Relief* [Adv. No. 17-01429, Dkt. No. 1] (the "Complaint") filed by Monarch Midstream, LLC (the "Plaintiff").   Utah respectfully states as follows:

**Responses to Allegations in the Complaint**

Utah denies all allegations in the Complaint that are not specifically admitted.

1. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§1334(b) and 2201.

**Answer**: The allegations in paragraph 1 consist of Plaintiff's legal conclusions to which

no response is required.

2. Jurisdiction in this Court is proper as a core proceeding pursuant to 28 U.S.C. §§157(b) and 1334.

**Answer**: The allegations in paragraph 2 consist of Plaintiff's legal conclusions to which no response is required.

3. This adversary proceeding relates to a bankruptcy case filed under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in a jointly administered case under Case No. 17-17465-KHT which is pending in the United States Bankruptcy Court for the District of Colorado. Therefore, venue is proper in this district under 28 U.S.C. §§1408 and 1409.

**Answer**: The allegations in paragraph 3 consist of Plaintiff's legal conclusions to which no response is required.

4. Plaintiff consents to the jurisdiction of this Court and to the entry of final orders or judgment by the bankruptcy judge.

**Answer**: The allegations in paragraph 4 consist of the Plaintiff's legal conclusions to which no response is required.

5. This adversary proceeding is commenced pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. §§2201 and 2202, which allows for the relief Monarch is seeking.

**Answer**: The allegations in paragraph 5 consist of the Plaintiff's legal conclusions to which no response is required.

6. Monarch is a Delaware limited liability company located at 5613 DTC Parkway, Suite 310, Greenwood Village, CO 80111. Monarch is the owner and operator of a natural gas gathering and processing system in Uintah and Duchesne Counties, Utah.

**Answer**: Utah admits the allegations in the first sentence of paragraph 6 on information and belief. Utah admits the allegations in the second sentence of paragraph 6.

7. Badlands Production Company, f/k/a Gasco Production Company, and Badlands Energy, Inc., f/k/a Gasco Energy, Inc., are Colorado corporations located at 7979 East Tufts Avenue, Suite 1150, Denver, CO 80237, and are Debtors in the above captioned bankruptcy cases. Badlands Energy, Inc. owns 100% of Badlands Production Company and will be collectively referred to as "Badlands".

**Answer**: Utah admits the allegations in the first sentence of paragraph 7 that Badlands Production Company and Badlands Energy, Inc. are Colorado corporations located at 7979 East Tufts Avenue, Suite 1150, Denver, CO 80237 on information and belief. Utah admits these corporations are debtors in the above captioned case. Utah admits the allegations in the second sentence of 7 on information and belief.

8. Badlands owns an interest in certain oil and gas leases in Uintah and Duchesne Counties, Utah and owns and has the right to deliver natural gas produced and saved from wells subject to those leases for gathering and processing.

**Answer**: Utah denies allegations in paragraph 8. On information and belief, Badlands has sold, and no longer owns, any interest in oil and gas leases in Uintah and Duchesne Counties, Utah.

9. Wapiti Utah, L.L.C. f/k/a/ Wapiti Newco. L.L.C. is a Delaware limited liability company which was the successful bidder for Badlands' assets. Both entities will be referred to as "Wapiti Utah".

**Answer**: Utah admits the allegations in paragraph 9 to the extent Badlands' "assets" is referring to the Riverbend assets.

10. Monarch and Badlands, as successor-in-interest to Gasco Production Company ("Gasco"), are parties to a Gas Gathering and Processing Agreement, effective March 1, 2010, which was amended and restated by the Amended and Restated Gas Gathering and Processing Agreement, effective March 22, 2012 (the "Amended and Restated Agreement"). *See* Exhibits 1 and 2. Under the Amended and Restated Agreement, Badlands agreed to dedicate certain natural gas reserves in Uintah and Duchesne Counties, Utah for gathering and processing at Monarch's facilities.

**Answer**: Utah admits the allegations in the first sentence of paragraph 10. Utah denies the allegations in the second sentence of paragraph 10 to the extent they mischaracterize the terms of the Amended and Restated Agreement which is a writing that speaks for itself. Utah admits that Exhibit 1 is a true and correct copy of the Gas Gathering and Processing Agreement, effective March 1, 2010. Utah admits that Exhibit 2 is a true and correct copy of the Amended and Restated Gas Gathering and Processing Agreement, effective March 22, 2012 (as amended,

3

the "GPA").

11. The Amended and Restated Agreement was amended on two occasions. Amendment No. 1 is dated November 6, 2012 and is effective as of March 22, 2012. Amendment No. 2 is dated August 29, 2014 and effective as of July 1, 2014. *See* Exhibits 3 and 4. The Amended and Restated Agreement, together with Amendment Nos. 1 and 2, are hereinafter referred to collectively as the "GPA."

**Answer**: Utah admits the allegations in paragraph 11 on information and belief. Utah admits that Exhibit 3 is a true and correct copy of Amendment No. 1 to the GPA. Utah admits that Exhibit 4 is a true and correct copy of Amendment No. 2 to the GPA.

12. Wapiti Oil & Gas II, LLC ("Wapiti") executed a Joinder to Amended and Restated Gas Gathering and Processing Agreement on March 22, 2012 to be effective as of the closing of the acquisition of 50% of Badlands' interest in the leases subject to the GPA. After the closing, Wapiti acquired a 50% interest in Badlands' oil and gas leases subject to the GPA. Therefore, both Badlands and Wapiti own and have the contractual obligation to deliver natural gas produced from wells on those leases to Monarch's facilities in accordance with the terms and conditions of the GPA. Badlands and Wapiti are hereinafter collectively referred to as "Producers."

**Answer**: Utah admits the allegations in the first sentence of paragraph 12 on information and belief. Utah admits the allegations in the second sentence of paragraph 12 on information and belief. Utah denies the allegations in the third sentence of paragraph 12 to the extent it mischaracterizes the terms of the GPA which is a writing the speaks for itself. The fourth sentence is a defined term to which no response is required.

13. Monarch and Gasco also entered into an Agreement for Disposal of Salt Water (the "SWDA"), effective February 26, 2010, under which Gasco committed produced water extracted from its well operations to Monarch's salt water disposal facilities in and around the Wilkin Ridge and Riverbend production areas in Utah. *See* Exhibit 5. On August 29, 2014, Amendment No. 1 to the SWDA was entered and is effective as of July 1, 2014. *See* Exhibit 6.

**Answer**: Utah admits that Monarch and Gasco entered into an Agreement for Disposal of Salt Water, effective February 26, 2010 (as amended, the "SWDA") on information and belief. Utah denies the allegations contained in the final portion of the first sentence of paragraph 13 to the extent it mischaracterizes the SWDA which is a writing that speaks for itself. Utah admits

the allegations in the second sentence of paragraph 13 on information and belief. Utah admits that Exhibit 5 is a true and correct copy of the Agreement for Disposal of Salt Water, effective February 26, 2010. Utah admits that Exhibit 6 is a true and correct copy of Amendment No. 1 to the Agreement for Disposal of Salt Water, effective July 1, 2014.

14. Gasco was required under the SWDA to cause any assignee of its leasehold existing as of February 26, 2010 to be bound to the SWDA. *See* SWDA, ¶2.1(a), p. 2 (Exhibit 5). Upon information and belief, Gasco caused Wapiti to be bound to the terms and conditions of the SWDA in accordance with the agreement.

**Answer**: Utah denies the allegations contained in the first sentence of paragraph 14 to the extent it mischaracterizes the SWDA which is a writing that speaks for itself. Utah does not have enough information to admit or deny the allegations in the second sentence of paragraph 14.

15. The GPA obligates the Producers to dedicate natural gas reserves subject to specified leases and/or located within a defined Area of Mutual Interest ("AMI") for gathering and processing at Monarch's facilities:

> 3.4 Dedicated Reserves. … Producer (i) exclusively dedicates and commits to the performance of this Agreement the Dedicated Reserves, (ii) represents that the Dedicated Reserves are not otherwise subject to any other gas gathering agreement or commitment and (iii) agrees not to deliver any Gas produced from the Dedicated Reserves and owned by Producer to any other gas gatherer, processor, or gas gathering system. Producer possesses the right to deliver the Dedicated Reserves to the Gathering System.

Amended and Restated Agreement, at ¶3.4, p. 8 (Exhibit 2).

"Dedicated Reserves" is defined in the GPA as:

> [T]he interest of Producer in all Gas reserves in and under, and all Gas owned by Producer and produced or delivered from (i) the Leases and (ii) other lands within the AMI, whether now owned or hereafter acquired, along with the processing rights, subject to certain volume exclusions as described herein, and any and all additional right, title, interest, or claim of every kind and character of Producer or its Affiliates in (x) the Leases or (y) lands within the AMI, and Gas production therefrom, and all interests in any wells, whether now existing or drilled hereafter, on, or completed on, lands covered by a Lease or within the AMI.

*Id.* at ¶1.1, p. 2.

**Answer**: Utah denies the allegations contained in paragraph 15 to the extent it mischaracterizes the GPA which is a writing that speaks for itself.

16. In exchange for Monarch's gas gathering and processing services, Producers agreed to pay a monthly fee along with other revenues and associated costs and expenses. *Id*. at ¶4.1, p. 9. The GPA contained Minimum Volume Commitments that obligated Producers to make deficiency payments to Monarch in the event their commitments of gas were less than a specified Quarterly Minimum Volume. *Id*. at ¶5.2, pp. 10-11. Terms governing these gathering and processing fees were amended by Amendment No. 1 and Amendment No. 2. *See* Amendment No. 1, subsection (e), p. 2 (Exhibit 3); Amendment No. 2, ¶4, pp. 3-4 (Exhibit 4).

**Answer**: Utah denies the allegations contained in paragraph 16 to the extent it mischaracterizes the GPA which is a writing that speaks for itself.

17. The Amended and Restated Agreement originally obligated Producers to "commit[] $50,000,000.00 (gross) for drilling and completing new wells in the AMI." Amended and Restated Agreement, at ¶3.3(b), p. 8 (Exhibit 2). Production from these wells within the AMI would be subject to the GPA as "Dedicated Reserves." Under Amendment No. 2, the commitments were revised, and Producers agreed to drill and complete 15 additional wells in the AMI in exchange for incentive payments from Monarch. *See* Amendment No. 2, ¶1(a), pp. 1-2 (Exhibit 4).

**Answer**: Utah denies the allegations contained in paragraph 17 to the extent it mischaracterizes the GPA which is a writing that speaks for itself.

18. The Amended and Restated Agreement, in conjunction with Producers' dedication of gas reserves and Monarch's processing services, also granted Monarch a right of way and easement affecting Producers' leasehold interests "for the purposes of installing, using, inspecting, repairing, operating, replacing, and removing [Monarch's] facilities (including installation of new custody transfer meters and other equipment) used or useful in the performance of this Agreement." *See* Exhibit "A" to Amended and Restated Agreement, at ¶4 (Exhibit 2).

**Answer**: Utah denies the allegations contained in paragraph 18 to the extent it mischaracterizes the GPA which is a writing that speaks for itself. Utah denies the allegations to the extent it suggests that Monarch recorded any easements affecting the leasehold interests which it did not.

19. Significantly, the GPA expressly provides that the covenants in the agreement run with the land and are binding on Producers and their successors and assigns:

> Producer agrees to cause any existing or future Affiliates of Producer holding Dedicated Reserves to be bound by, and to execute and join as a party, this Agreement. The dedication and commitment made by Producer under this Agreement is a covenant running with the land.

Amended and Restated Agreement, at ¶3.4, p. 8 (Exhibit 2).

**Answer**: Utah denies the allegations contained in paragraph 19 to the extent it mischaracterizes the GPA which is a writing that speaks for itself. Utah denies the allegations to the extent it suggests that the GPA or any part thereof is a covenant running with the land.

20. A recording memorandum was also attached to the GPA. *See* Memorandum of Amended and Restated Gas Gathering and Processing Agreement, attached as Exhibit D to Amended and Restated Agreement (Exhibit 2). Like the GPA itself, the memorandum provided that the covenants contained in the Amended and Restated Agreement run with the land and are binding on all successors and assigns:

> This Memorandum and all rights and covenants in connection herewith shall run with the underlying Leases and associated lands and shall be binding upon the parties hereto and their respective successors and assigns.

*Id*. at ¶6.

**Answer**: Utah denies the allegations contained in paragraph 20 to the extent it mischaracterizes the GPA which is a writing that speaks for itself. Utah denies the allegations in paragraph 20 to the extent it suggests that the memorandum attached to the GPA was recorded in the real property records which it was not.

21. The SWDA obligates Producers to commit and deliver all produced water extracted from oil and gas wells in certain areas within the AMI – known as the Wilkin Ridge and Riverbend Production Areas – to saltwater disposal facilities owned and operated by Monarch.

*See* Agreement for Disposal of Salt Water, ¶2.1(a), p. 2 and Schedule A (Exhibit 4).

**Answer**: Utah denies the allegations contained in paragraph 21 to the extent it mischaracterizes the SWDA which is a writing that speaks for itself.

7

22. In exchange for Monarch's disposal and treatment of the produced water from Producers' oil and gas wells, Producers agreed to pay disposal fees detailed in the SWDA. *Id*. at ¶3.1, p. 3.

**Answer**: Utah denies the allegations contained in paragraph 22 to the extent it mischaracterizes the SWDA which is a writing that speaks for itself.

23. The SWDA, similar to the GPA, provided that the commitments in the agreement run with the land and bind all successors and assigns:

> Gasco further agrees to cause any assignee of Gasco's now-existing leasehold to be bound by this Agreement. The commitment made by Gasco hereunder is a covenant running with the land.

*Id*. at ¶2.1(a), p. 2.

**Answer**: Utah denies the allegations contained in paragraph 23 to the extent it mischaracterizes the SWDA which is a writing that speaks for itself.

24. On August 11, 2017, Badlands and certain of its affiliates filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**Answer**: Utah admits the allegations contained in paragraph 24.

25. On August 14, 2017, Badlands filed a *Motion for Entry of an Order (A) Approving the Purchase and Sale Agreement Between Badlands Production Company and the Successful Auction Bidder, (B) Authorizing the Sale of Substantially All of its Property Pursuant Thereto, Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (hereinafter, "Motion for Approval of Asset Sale") [Docket. No. 18, in Case 17-17465-KHT].

**Answer**: Utah admits the allegations contained in paragraph 25.

26. The Motion for Approval of Asset Sale identified Wapiti Utah (at the time called Wapiti Utah) as a "Stalking Horse Bidder" and potential purchaser of Badlands' assets.

**Answer**: Utah admits the allegations contained in paragraph 26 to the extent the Badlands' "assets" is referring to the Riverbend assets.

27. Badlands and Wapiti Utah entered into a Purchase and Sale Agreement, dated August 7, 2017, by which Wapiti Utah proposes to purchase substantially all of Badlands' assets and assume specified contracts, liabilities and obligations of the debtor. Motion for Approval of Asset Sale, at ¶¶8-9, pp. 2-3 and Exhibit "A" to the Motion [Docket. No. 18, in Case 17-17465-KHT].

**Answer**: Utah denies the allegations contained in paragraph 27 to the extent it mischaracterizes the Purchase and Sale Agreement ("PSA") which is a writing that speaks for itself.

28. Pursuant to the Purchase and Sale Agreement, Wapiti Utah proposes specifically to purchase all of Badlands' "Oil and Gas Interests," including the lease interests currently subject to the GPA and SWDA. Purchase and Sale Agreement, ¶1, p. 1, attached as Exhibit "A" to Motion for Approval of Asset Sale [Docket. No. 18, in Case 17-17465-KHT]. The Purchase and Sale Agreement, at the same time, provides that Wapiti Utah shall not assume liability under any contracts with Monarch in connection with the purchase of Badlands' assets, including the GPA and SWDA. *Id*. at ¶2(a), p. 3.

**Answer**: Utah denies the allegations contained in paragraph 28 to the extent it mischaracterizes the PSA which is a writing that speaks for itself. Utah admits to the allegations contained in paragraph 28 to the extent it suggests that Utah did not assume any contracts with Monarch. Utah explicitly did not assume any contracts between Monarch and Badlands.

29. Among the additional relief sought by Badlands in its Motion for Approval of Asset Sale is an order pursuant to §363(f) of the Bankruptcy Code authorizing the sale of its assets "free and clear" of any liabilities not assumed by Wapiti Utah under the Purchase and Sale Agreement, which would include the GPA and SWDA. Motion for Approval of Asset Sale, at ¶¶33-35, pp. 13-14 [Docket. No. 18, in Case 17-17465-KHT].

**Answer**: Utah denies the allegations contained in paragraph 29 to the extent it mischaracterizes the Sale Motion which is a writing that speaks for itself. Utah admits to the allegations contained in paragraph 28 to the extent it suggests that Utah did not assume any contracts between Monarch and Badlands.

30. Thus, by operation of the proposed asset sale to Wapiti Utah, Badlands seeks to effectively strip its lease interests of the contractual burdens imposed in the GPA and SWDA notwithstanding that both agreements contain dedications and commitments of hydrocarbons and produced water that are real covenants running with the land that remain binding on Badlands' successors.

**Answer**: Utah admits the allegation contained in paragraph 30 to the extent it means that Badlands sold the leased interest free and clear of the GPA and SWDA. Utah denies the allegations that the GPA and SWDA to the extent it mischaracterizes the GPA or the SWDA

which are writings that speak for themselves. Utah denies the allegations in paragraph 30 that the GPA or SWDA contains covenants running with the land that remain binding on Badland's successors.

31. On October 12, 2017, Wapiti Utah became the successful bidder of Badlands' assets and seeks to have the Purchase and Sale Agreement approved by the Bankruptcy Court. This will result in Wapiti Utah obtaining Badlands' assets free and clear of Monarch's rights and interest and absolve Wapiti Utah of the contractual obligations contained in the GPA and SWDA.

**Answer**: Utah admits that it became the successful bidder of Badland's Riverbend assets. Utah denies that Utah sought to have the PSA approved by the Bankruptcy Court as it was the Debtors that filed the Sale Motion seeking approval of the sale. Utah admits the allegation in the second sentence of paragraph 2 to the extent it is describing the legal effect of the bankruptcy sale.

32. Monarch restates and incorporates all allegations set forth in each of the preceding paragraphs as if fully set forth herein.

**Answer**: Utah refers to its prior answers.

33. Covenants running with the land, as a matter of law and equity, are binding on successors-in-interest and thus are not "interests" under §363 of the Bankruptcy Code. Therefore, property owned by a bankruptcy debtor cannot be sold "free and clear" of covenants running with the land. See *In re Banning Lewis Ranch Co., LLC,* 532 B.R. 335, 347 (Bankr. D. Colo. June 22, 2015) (citing *In re Lonesome Pine Holdings, LLC,* Case No. 10-34560 HRT, 2011 Bankr. LEXIS 5775 (Bankr. D. Colo. Sept. 1, 2011)).

**Answer**. The allegations in paragraph 33 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 33.

34. Monarch and Producers intended that the covenants in the GPA and SWDA run with the land. Both agreements expressly provide that Producers' dedications and commitments shall "run with the land."

**Answer**. Utah denies the allegations in the first sentence of paragraph 34. Utah denies the allegations in the second sentence of paragraph 34 to the extent it mischaracterizes the terms

of the GPA and the SWDA which are writings that speak for themselves.

35. The dedications of natural gas in the GPA, together with all associated commitments in the agreement, "touch and concern" Badlands' leasehold interests insofar as they closely relate to and affect the use, value and/or enjoyment of the interests.

**Answer**. The allegations in paragraph 35 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 35.

36. The dedications of produced water in the SWDA, together with all associated commitments in the agreement, "touch and concern" Badlands' leasehold interests insofar as they closely relate to and affect the use, value and/or enjoyment of the interests.

**Answer**. The allegations in paragraph 36 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 36.

37. The dedications and commitments contained in the GPA and SWDA constitute covenants running at law and in equity because the requisite intent exists by the express terms of the agreements, and the covenants "touch and concern" Badlands' lease interests.

**Answer**. The allegations in paragraph 37 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 37.

38. Accordingly, Monarch is entitled to a judgment pursuant to 28 U.S.C. §§2201 and 2202 declaring that the covenants in the GPA and SWDA run with the land, as a matter of law and equity, and that Badlands' lease interests cannot be sold "free and clear" of the GPA and SWDA.

**Answer**. The allegations in paragraph 38 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 38.

39. Monarch restates and incorporates all allegations set forth in each of the preceding paragraphs as if fully set forth herein.

**Answer**: Utah refers to its prior answers.

11

40. Badlands is in breach of the GPA and SWDA for nonpayment of fees for gas which flowed through Monarch pipelines in an amount not less than $1.2 Million.

**Answer**: Utah is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40.

41. Since the GPA and SWDA are covenants running with the land and cannot be rejected, the agreements must be assigned to Wapiti Utah as part of the sale of Badlands' assets.

**Answer**. The allegations in paragraph 41 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 41.

42. In order to assume and assign the agreements, the default must be cured pursuant to Bankruptcy Code §365(b)(1) and §365(f)(2).

**Answer**. The allegations in paragraph 42 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 42.

43. In the alternative, the obligations under the GPA and SWDA, including the defaults, are obligations which Wapiti Utah is responsible for since they are covenants running with the land and Wapiti Utah is the owner of Badlands' assets.

**Answer**. The allegations in paragraph 43 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 43.

44. Therefore, Wapiti Utah is responsible for payment of the breach by Badlands in an amount to be proved at trial but in any event not less than $1.2 Million.

**Answer**. The allegations in paragraph 44 consist of Monarch's characterization of their claims or rights and legal conclusions to which no response is required. To the extent a response is required, Utah denies the allegations in paragraph 44.

## Affirmative Defenses

Without admitting any of the allegations in the Complaint, Utah asserts the following affirmative defenses and expressly reserves the right to supplement these affirmative defenses.

## First Affirmative Defense

The Riverbend assets were sold to Utah free and clear of the GPA, the SWDA and Monarch's claims against Badlands under Section 363(f) of the Bankruptcy Code.

## Second Affirmative Defense

Utah did not assume the GPA or the SWDA and is not required to perform under these contracts.

## Third Affirmative Defense

Monarch did not record the recording memorandum attached GPA so the GPA does not constitute a covenant running with the land.

## Fourth Affirmative Defense

There is no recording of the SWDA in the real property records so the SWDA does not constitute a covenant running with the land.

WHEREFORE, Utah respectfully requests that the Court enter a judgement in its favor that (1) denies Monarch's requested relief, (2) makes the following findings of facts and legal conclusions: (A) the Riverbend assets are sold free and clear of the GPA and the SWDA, and (B) Monarch is barred from proceeding with any action against Buyer, or any of its successors or assigns, to collect any claim Monarch has against the Debtor; and (3) providing for such other relief as may be just and proper, including attorneys' fees and costs of Utah.

Dated: November 30, 2017

DIAMOND McCARTHY LLP

By: *Kyung S. Lee*
Kyung S. Lee
Charles M. Rubio
909 Fannin, Suite 3700
Houston, Texas 77010
Telephone: 713-333-5100
Facsimile: 713-333-5199
klee@diamondmccarthy.com
crubio@diamondmccarthy.com

*Counsel to Wapiti Utah, L.L.C. f/k/a Wapiti Newco, L.L.C.*

14

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing was served by electronic transmission to counsel for Monarch Midstream LLC, David M. Rich (dmrich@comcast.net) and counsel for Badlands Production Company, Theodore J. Hartl (thartl@lindquist.com) on the 30th day of November 2017.

                                                                        */s/ Kyung S. Lee*