# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BADLANDS ENERGY, INC. | ) | Case No. 17-17465 KHT |
| EIN: 98-0204105, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| BADLANDS PRODUCTION COMPANY | ) | Case No. 17-17467 KHT |
| EIN: 84-1461816, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| BADLANDS ENERGY-UTAH, LLC | ) | Case No.  17-17469 KHT |
| EIN: 47-2023934, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| MYTON OILFIELD RENTALS, LLC | ) | Case No.  17-17471 KHT |
| EIN: 20-1202389, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | **Jointly Administered Under** |
| | ) | **Case No.  17-17465 KHT** |

| | | |
|---|---|---|
| MONARCH MIDSTREAM, LLC, f/k/a | ) | Adversary Proceeding |
| MONARCH NATURAL GAS, LLC, | ) | No. 17-1429-KHT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BADLANDS PRODUCTION | ) | |
| COMPANY, f/k/a GASCO | ) | |
| PRODUCTION COMPANY, a | ) | |
| Colorado corporation; BADLANDS | ) | |
| ENERGY INC., f/k/a GASCO | ) | |
| ENERGY, INC., a Colorado | ) | |
| corporation; and WAPITI UTAH, | ) | |
| L.L.C. f/k/a WAPITI NEWCO, L.L.C., | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Defendants. | | |

## WAPITI UTAH, L.L.C.'S MOTION FOR JUDGMENT ON THE PLEADINGS

Wapiti Utah, L.L.C. f/k/a Wapiti Newco, L.L.C. ("Utah LLC") files this Motion for Judgment on the Pleadings (the "Motion") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and would respectfully show the following:

### I. SUMMARY OF ARGUMENT

1.    A motion for judgment on the pleadings is appropriate when a party is entitled to a judgment as a matter of law.  Here, Utah LLC purchased assets from Debtor Badlands Production Company under Section 363 of the Bankruptcy Code.  Utah LLC bought the assets "free and clear" of liens, claims and other encumbrances under Section 363(f) of the Bankruptcy Code.

2.    Unsatisfied with its status a pre-petition creditor, Monarch Midstream, LLC f/k/a Monarch Natural Gas, LLC ("Monarch") filed its complaint in this adversary proceeding (the "Complaint") seeking a ruling from this Court to require the buyer, Utah LLC, to be responsible for satisfaction of its pre-petition claims.   This requested relief is fundamentally at odds with the concept of a "free and clear" sale and should be rejected by this Court as a matter of law.

3.    Under a mistaken interpretation of bankruptcy and Utah law, Monarch incorrectly relies on a "covenant running with the land" argument to improperly saddle Utah LLC not only with prepetition claims against the Debtor, but also with the obligations of Monarch's gas gathering system.  Monarch contends that Utah LLC must continue using Monarch's gas gathering system and must continue to perform under the terms of the gas processing agreement and the salt water disposal agreement.

2

4.      The Debtor, not Utah LLC, entered into the gas processing agreement and the salt water disposal agreement with Monarch.  Utah LLC specifically did not assume these contracts as part of the asset purchase.  Utah LLC is not a party to any contracts with Monarch and as such Monarch cannot maintain a breach of contract claim against Utah LLC.

5.      Monarch's "covenant running with the land" argument conflicts with Section 365 of the Bankruptcy Code.  Under Section 365, the debtor has the discretion to assume and assign contracts.  Here, Monarch argues that Utah LLC is required to assume Monarch's contracts despite the fact that the Debtor did not assume the contracts and Utah LLC did not accept assignment of the contracts.  To this day, the Debtor has neither rejected nor assumed the Monarch contracts.

6.      There is no legal basis under Bankruptcy Code or applicable state law to require Utah LLC to assume a contract and become a counter-party to Monarch.  Quite simply, Utah LLC never agreed to the terms of these contracts.  This Court should reject Monarch's required assumption argument.

7.      For these reasons, the Court should enter judgment that denies Monarch's requested relief and holds that: (i) Monarch is barred from proceeding with any action against Buyer (or any of its successors or assigns) to collect any claim it has against the Debtor, and (ii) Monarch is barred from proceeding with any action to enforce the terms of the gas processing agreement or the saltwater disposal agreement against Utah LLC.

## II. VENUE, JURISDICTION & CONSTITUTIONAL AUTHORITY

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

9.      Venue is proper pursuant to 28 U.S.C. § 1408(1).

10.     This Court has the constitutional authority to enter a final order regarding the issues raised in this matter.  This matter arises out of provisions of the Bankruptcy Code[1] and the Bankruptcy Rules, specifically 11 U.S.C. § 363.   For these reasons, the Court has the constitutional authority to enter a final order adjudicating the claims in this adversary proceeding.

### III.    FACTUAL BACKGROUND

11.     The Court must accept the allegations in the Complaint as true for purposes of this Motion.  *See infra* § IV.A.  The Complaint is based entirely on the terms of the Amended and Restated Gas Gathering and Processing Agreement (the "GPA"),[2] and Agreement for Disposal of Salt Water (the "SWDA") (collectively, the "Contracts") and this Court's prior orders and rulings.  Utah LLC therefore incorporates those materials by reference and, with respect to the Court's orders and rulings, asks that the Court take judicial notice of them.

12.     Shortly after Badlands filed bankruptcy, Badlands filed a *Motion for Entry of an Order (A) Approving the Purchase and Sale Agreement Between Badlands Production Company and the Successful Auction Bidder, (B) Authorizing the Sale Of Substantially all of ots Property Pursuant Thereto, Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [ECF No. 18] (the "Sale Motion") as well as *Motion to Approve Entry of an Order (A) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially all of its Assets, (B)*

---

[1] Unless otherwise noted, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

[2] Unless otherwise defined, capitalized terms have the definitions given to them in the Motion or in the Asset Purchase Agreement, dated August 7, 2017, between Utah LLC and Badlands Production Company.  ECF No. 63-1.

*Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief* [ECF No. 21].

13.     As explained in the Sale Motion, Badlands negotiated with Utah LLC in July and August 2017 and agreed to have Utah LLC serve as a stalking horse bidder pursuant to a Stalking Horse Purchase Agreement for the purchase of substantially all of Badlands's Riverbend assets (the "Assets").  Badlands also asked the Court for authorization to sell those Assets free and clear of all liens, claims, and encumbrances under § 363(f) of the Bankruptcy Code.

14.     Pursuant to the Sale Motion and Bidding Procedures, Badlands conducted a competitive bidding and auction process that resulted in Utah LLC having the highest or otherwise best bid for the Assets.  *See* Transcript of Oct. 25, 2017 Proceedings, Case No. 17-17465-KHT (attached as **Exhibit A**).

15.     Monarch filed its Complaint on October 23, 2017.  ECF No. 1.  On October 25, 2017, the Court held a hearing on the Sale Motion and determined that it would approve the sale of the Assets to Utah LLC.  Ex. A at 47.  On October 26, 2017, the Court entered an order approving the sale [ECF No. 223].

## IV. ARGUMENT

### A.  Standard on a Motion for Judgment on the Pleadings

16.     Federal Rule of Civil Procedure 12(c) states that "after the pleadings are closed but early enough not to delay trial–a party may move for judgment on the pleadings."  A Rule 12(c) motion is proper when the moving party has "clearly established that no material issue of

fact remains to be resolved and the party is entitled to judgment as a matter of law." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

17.     When adjudicating a motion for judgment on the pleadings, well-pleaded factual allegations in the complaint are accepted as true and are viewed in the light most favorable to the plaintiff. *Sanchez v. United States Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017).  Mere labels and legal conclusions, however, are not accepted as true. *Id.*

### B.  Utah LLC Cannot Be Liable for Breach of Contract

i.     No Contract Exists Between Utah LLC and Monarch

18.     To recover for breach of contract, Monarch must show that (1) a contract existed between the parties; (2) Monarch performed its duties under the contract (or that it was justified in failing to do so); (3) Utah LLC failed to perform the contract; and (4) Monarch was damaged as a result. *W. Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

19.     Utah LLC is not a party to any contracts with Monarch, as Monarch admits when it alleges only that "*Badlands* is in breach of the GPA and SWDA . . .."  Compl., at ¶ 40 (emphasis added).  Monarch simply cannot state a claim against Utah LLC for breach of a contract to which it is not a party.  The only claim that Monarch may have is a pre-petition contractual claim against Badlands.

ii.     Utah LLC Cannot Be Forced to Assume the Contracts or Cure Defaults

20.     Alternatively, Monarch argues that it has breach of contract claims against Utah LLC because the Contracts "must be assigned to [Utah LLC]" and "default[s] must be cured pursuant to Bankruptcy Code §365(b)(1) and §365(f)(2)."  Compl., at ¶¶ 41–42.

21.     Section 365(a) of the Bankruptcy Code states that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor." If the debtor defaulted on the executory contract, the debtor must cure the default before it can assume the contract. 11 U.S.C. § 365(b).

22. Nothing in the Bankruptcy Code requires the debtor or a third-party to assume an executory contract, despite what Monarch contends. "[A]ccording to the plain meaning of § 365(d)(2), a debtor may *or may not* assume or reject an executory contract." *In re Hernandez*, 287 B.R. 795, 803 (Bankr. D. Ariz. 2002) (emphasis added); *see also In re Rollins*, 175 B.R. 69, 77 (Bankr. E.D. Cal. 1994) ("Some judgments and decisions the Bankruptcy Code requires a trustee to make are discretionary, such as the decision to assume or reject an executory contract."). The Code instead gives debtors discretion to decide whether to assume, reject, assign, or allow the pass-through of executory contracts. *See* 11 U.S.C. § 365.

23. Thus, Monarch is incorrect when it states that "[s]ince the GPA and SWDA are covenants running with the land and cannot be rejected, the agreements must be assigned to [Utah LLC] as part of the sale of Badlands' assets." Compl. at ¶ 41. The Bankruptcy Court does not require Utah LLC to assume the Contracts. Rather, Badlands must decide whether to assume the Contracts and pay cure costs; Monarch cannot force Utah LLC to make those decisions on Badlands's behalf. Badlands has not assumed the Contracts or assigned them to Utah LLC.

24. Finally, Monarch's argument is fundamentally confused about the nature of executory contracts. Covenants running with the land *cannot be executory contracts*. *See Matter of Topco, Inc.*, 894 F.2d 727, 739 n.17 (5th Cir. 1990); *In re Beeter*, 173 B.R. 108, 114 (Bankr. W.D. Tex. 1994). Thus, even if the Contracts were covenants, Badlands cannot assume them or assign them to Utah LLC.

25. For these reasons, Monarch's argument that Utah LLC must assume and cure unpaid amounts under the Contracts is unsupported.

     iii.    <u>Utah LLC Purchased Free and Clear of Monarch's Breach of Contract Claim Against Badlands</u>

26.    To the extent Monarch argues that its prepetition claim against Badlands is an interest in property, Utah LLC purchased free and clear of such interest.  Under Bankruptcy Code § 363(f), a debtor-in-possession can sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following five conditions is met:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5).  Although the term "interest" is not defined in the Bankruptcy Code, "the trend seems to be toward a more expansive reading of interest in property as encompassing other obligations [besides *in rem* obligations] that may flow from ownership of the property." *In re Telluride Income Growth, L.P.*, 364 B.R. 390, 405 (10th Cir. BAP 2007).

27.    Rights to payment, including unliquidated legal claims, are "claims" under the Bankruptcy Code.  11 U.S.C. § 101(5) ("The term 'claim' means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").  Bankruptcy courts have the power to sell free and clear of such claims.  *See, e.g.*, *In re PBBPC, Inc.*, 484 B.R. 860, 869 (B.A.P. 1st Cir. 2013) (holding that buyer's purchase of operating assets was free and clear of predecessor-debtor's unemployment "contribution rate," which reflected claims for past-due

benefit charges attributable to predecessor-debtor's account); *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3rd Cir. 2003) (holding that sale of an airline's assets was free of any successor liability claims arising out of pending employment claims or an employee class-action settlement).

28.     As the cases above demonstrate, Monarch's claims for breaches of the Contracts are claims for money subject to § 363(f). *Id.* Further, they can be sold free and clear pursuant to § 363(f)(5). In Utah and Colorado, common law breach of contract claims can be satisfied by money judgments. *Cent. Utah Water Conservancy Dist. v. Upper E. Union Irrigation Co.*, 321 P.3d 1113, 1123 n.3 (Utah 2013); *Leach v. Fuller*, 173 P. 427, 428 (Colo. 1918). Indeed, Monarch's Complaint seeks money damages in the amount of $1.2 million on account of Badlands's alleged breaches of the Contracts. Compl. at ¶ 44. Because Utah LLC purchased the Assets free and clear of any claims that Monarch may have against Badlands, Monarch cannot maintain breach of contract claims against Utah LLC.

### C.  Utah LLC Purchased Free and Clear of Any Alleged Covenants that Run with the Land

29.     In addition to purchasing free and clear of any legal claims, Utah LLC also purchased free and clear of any alleged covenants running with the Assets.

### i.     Monarch Misconstrues the Term Covenant to Mean the Entirety of the Contracts Including All Outstanding Obligations Under the Contracts

30.     Rather than identifying particular covenants in the Contracts, Monarch takes the position that each Contract in its entirety is a "covenant." Compl. at ¶¶ 38, 43. Monarch's argument is unsupported.

31.     A covenant is a "[a] promise made in a deed or implied by law; esp., an obligation in a deed burdening or favoring a landowner." COVENANT, Black's Law Dictionary (10th ed.

2014).  "In their nature, covenants are first cousins to easements appurtenant . . . the beneficiary of a covenant . . . may require the owner of that land to do, or more likely not to do, something on that land." Roger A. Cunningham et al., THE LAW OF PROPERTY § 8.13, at 467 (2d ed. 1993) (emphasis added).

32.     Here, Monarch takes an expansive but incorrect view of the various legal entitlements that comprise its "covenant."  Rather than identify certain terms of the Contracts which may constitute "covenants" running with the land, Monarch's view is that the Utah LLC is required to perform all the terms in the Contracts, including the precise formulas for calculating the payments due under the Contracts.

33.     Neither Utah law nor the law of real covenants generally supports Monarch's position.  At most, only specific terms within a contract can qualify as real covenants.  *See Stern v. Metro. Water Dist. of Salt Lake & Sandy*, 274 P.3d 935, 945 (Utah 2012) (finding that a single clause within a deed, not the deed itself, was a real covenant); *View Condo. Owners Ass'n v. MSICO, L.L.C.*, 127 P.3d 697, 699 (Utah 2005) (interpreting a declaration of covenants related to a subdivision plat, not the entirety of the deeds comprising the plat).  The remaining terms retain whatever contractual force the parties gave to them, but they do not run with the land.  *See id.* Because Monarch fails to identify the actual covenants it seeks to enforce, the Court should deny its request for a declaration stating that unspecified covenants run with the Assets.

ii.     Any Real Covenants Are Subject to § 363(f) of the Bankruptcy Code

34.     Under Bankruptcy Code § 363(f), the term "interest" includes real covenants. *Newco Energy v. Energytec, Inc. et al. (In re Energytec, Inc.)*, 739 F.3d 215 (5th Cir. 2013).  In *Energytec*, a creditor alleged that its interests in the debtor's natural gas pipeline were real covenants.  *Id.* at 218.  Despite finding that the interests were real covenants under Texas law,

10

the Fifth Circuit remanded the case to the district court for a determination whether those covenants could be extinguished under § 363(f)(5).[3]  *Id.* at 225–26.  Thus, the relevant question is not whether an interest is a covenant running with the land, but whether it can be sold free and clear under § 363(f)(1)–(5).

35.     Here, subsections (1) and (5) apply and permit a free and clear sale.  First, applicable non-bankruptcy law permits the sale of the assets free and clear of the obligations arising from the Contracts.  Specifically, Utah law permits a foreclosure sale free and clear of unrecorded interests.  *Ketchum, Konkel, Barrett, Nickel & Austin v. Heritage Mountain Dev. Co.*, 784 P.2d 1217, 1225 (Utah Ct. App. 1989) (holding that Utah Code § 78B-6-903 "clearly provides that an unrecorded lien is cut off by a foreclosure action.").[4]  Therefore, Utah LLC's purchase of the Assets is free and clear of Monarch's interests pursuant to § 363(f)(1).

36.     Utah LLC's purchase was also free and clear under § 363(f)(5).  Monarch's "interests" are simply contractual obligations that Badlands incurred to make certain payments.  In a suit at common law, Monarch's interests could be satisfied by a money judgment for damages.  *Cent. Utah Water Conservancy Dist. v. Upper E. Union Irrigation Co.*, 321 P.3d 1113, 1123 n.3 (Utah 2013).  Future damages could be estimated using a discount for future cash flows.  Monarch admits that the covenant can be satisfied by a money judgment by bringing a

---

[3] The parties settled shortly after remand.

[4] Monarch acknowledges that a recording memorandum was attached to the GPA, but does not allege that the memorandum was recorded in the real property records.  This tacit admission that Monarch did not record the GPA suggests that the obligations therein were personal and did not run with the land. *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 629 (Utah 1989) ("[A] properly executed and recorded writing also serves the critical and important function of imparting notice to subsequent purchasers.").

breach of contract claim in the adversary seeking payment of $1.2 million owed by Badlands. Compl. at ¶ 44.

37.     For these reasons, Utah LLC purchased the Assets free and clear of Monarch's interests therein.

**D.  The Contracts Are Not Covenants Running with the Land[5]**

i.      Neither the Contracts nor any Terms Therein Touch or Concern the Assets

38.     In any event, Monarch is not entitled to declaratory judgment because the Contracts do not contain any covenants that run with the land.  For such a covenant to exist under Utah law, "(1) [t]he covenant must "touch and concern" the land; (2) the covenanting parties must intend the covenant to run with the land; and (3) there must be privity of estate." *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 623 (Utah 1989).

39.     Monarch's alleged covenants do not "touch or concern" the Assets.  "What is essential" to real covenants and the touch and concern requirement in particular "is that the burdens and benefits created must relate to the land and the ownership of an interest in it; the burdens and benefits created are not the personal duties or rights of the parties to a covenant that exist independently from the ownership of an interest in the land." *Flying Diamond Oil Corp*, 776 P.2d at 623.

40.     In *Flying Diamond*, the Court favorably cited *Eagle Enterprises, Inc. v. Gross*, 349 N.E.2d 816, 817 (N.Y. 1976), where the Court of Appeals of New York held that a covenant

---

[5] The Contracts are not equitable servitudes.  "For a covenant to run in equity, it must 'touch and concern' the land, and there must be an intent that it run.  Privity is not required, but the successor must have notice of the covenant." *Flying Diamond*, 776 P.2d at 623 nn.5–6.  To the extent the Complaint seeks a declaration that the Contracts are equitable servitudes, the Court should reject that request for the reasons stated in this Section D.

requiring a grantee to purchase water from the grantor did not touch and concern the land. There, the original grants purported to require grantees to pay $35.00 per year to purchase and accept delivery of water during the spring and summer. *Id.* Successors-in-interest to certain grantees later built their own water well on the property and no longer wanted to purchase water from the grantor. *Id.* at 818. In holding that the water obligation did not touch and concern the land, the Court of Appeals noted that the land would not be waterless in the absence of the obligation nor would it have been prohibitively expensive for landowners to obtain water from other sources. *Id.* at 819. In short, "[t]he obligation to receive water from appellant resembles a personal, contractual promise to purchase water rather than a significant interest attaching to respondent's property." *Id.*

41.     The SWDA creates a similar obligation. Specifically, the SWDA states that Badlands "commits all Water requiring disposal from its operations . . . to Monarch's Disposal Facilities" and requires that Badlands pay certain fees for water disposal. Compl., Ex. 5, at §§ 2.1(a), 3.1. Like the water covenant in *Eagle Enterprises*, the SWDA is merely a personal obligation to purchase service from Monarch.

42.     The same logic applies to the GPA. Instead of water services, it obligates Badlands to purchase gas transmission or transportation services from Monarch. Requiring Badlands to purchase services is simply a personal obligation that does not run with the land.

43.     The Contracts also do not touch and concern the land because they address the transportation, gathering, or disposal of personal property, not real property. In Utah, "*[u]ndetached* minerals are part of the earth and therefore realty." *Chase v. Morgan*, 339 P.2d 1019, 1021 (Utah 1959). "Minerals" include gas but not water. *See Patterson v. Wilcox*, 358

P.2d 88, 90 (Utah 1961); *Stephen Hays Estate, Inc., v. Togliatti*, 38 P.2d 1066, 1068 (Utah 1934). Thus, water and extracted gas are not interests in real property.

44.     Recently, in *In re Sabine Oil & Gas Corporation*, the United States District Court for the Southern District of New York considered whether gas gathering agreements were covenants running with the land under Texas law.[6]   *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 69 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017).   That court determined that the agreements did not "touch and concern" the land because they governed extracted gas, which under Texas law is not a mineral.   *Id.* at 77.   In reaching this holding, the Court explained that the agreements did not contain covenants because the agreements "concern[ed] only the Products produced from real property and affect only [the debtor]'s personal property rights."   *Id.*

45.     The same is true in this case.   Neither Contract touches or concerns the Assets. The SWDA is a water disposal agreement and does not govern with mineral (i.e., real property) interests at all.   The GPA governs the gathering of *extracted* gas, which is personal property. Because the Contracts affect only personal property, they cannot be covenants running with the land.

## V. CONCLUSION

For the reasons stated above, Utah LLC, the buyer, respectfully requests that the Court render a judgment pursuant to Rule 12(c) (i) denying Monarch's requested relief, (ii) ruling that Monarch is barred from proceeding with any action against Utah LLC (or any of its successors or assigns) to (A) collect any claims Monarch has against the Debtor or (B) enforce the terms of the GPA and the SWDA; and (iii) providing for such other relief as may be just and proper.

---

[6] Utah LLC has not found any authority indicating that Texas's "touch and concern" requirement is any stricter than Utah's.

Dated: January 25, 2018.

DIAMOND MCCARTHY LLP

*/s/ Kyung S. Lee*
Kyung S. Lee
klee@diamondmccarthy.com
Charles M. Rubio
crubio@diamondmccarthy.com
909 Fannin, Suite 3700
Houston, TX 77010
Telephone:  713-333-5100
Facsimile:  713-333-5199

*Attorneys for Wapiti Utah L.L.C.*
*f/k/a Wapiti Newco, LLC*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In Re. | ) | |
| | ) | |
| BADLANDS ENERGY INC. | ) | **17-17465-KHT** |
| EIN 98-0204105          and | ) | |
| BADLANDS PRODUCTION COMPANY | ) | **Chapter 11** |
| EIN 84-1461816          and | ) | |
| BADLANDS ENERGY-UTAH, LLC      and | ) | |
| EIN 47-2023934          and | ) | |
| MYTON OILFIELD RENTALS, INC. | ) | |
| Debtors. | ) | |
| | ) | |
| Evidentiary Sale Hearing - Riverbend | ) | |
| Assets.  Motion for Entry of An Order | ) | |
| (A) Approving the Purchase and Sale | ) | |
| Agreement Between Badlands Production | ) | |
| Company and the Successful Auction | ) | |
| Bidder, (B) Authorizing the Sale of | ) | |
| Substantially All of Its Property | ) | |
| Pursuant Thereto, Free and Clear of | ) | |
| Liens, Claims, Encumbrances, and | ) | |
| Interests, (C) Authorizing the | ) | |
| Assumption and Assignment of Contracts, | ) | |
| and (D) Granting Related Relief | ) | |
| (Docket #18) ("Sale Motion") and | ) | |
| Objection of Dorrier Equities, Ltd. and | ) | |
| Markham LLC.  All other objections | ) | |
| resolved by the parties pursuant to | ) | |
| revisions to the form of order. | ) | |
| _____ | ) | |

**Courtroom D**
**October 25, 2017**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE KIMBERLY H. TYSON**
**WEDNESDAY, OCTOBER 25, 2017; 10:00 A.M.**
**DENVER, COLORADO**

**FOR THE DEBTORS:**
    Theodore J. Hartl, Esq.
    600 17th Street, Suite 1800 South
    Denver, Colorado  80202

**FOR WAPITI UTAH LLC f/k/a WAPITI NEWCO LLC:**
    Kyung S. Lee, Esq.
    Charles M. Rubio, Esq.
    Two Houston Center
    909 Fannin Street, 37th Floor
    Houston, Texas 77010

**FOR WAPITI OIL AND GAS II:**
    Mitchell E. Ayer, Esq.
    Steven J. Levitt, Esq.
    333 Clay Street, Suite 3300
    Houston, Texas  77002

**FOR HALLIBURTON ENERGY SERVICES INC. AND MULTI-CHEM:**
    Timothy M. Swanson, Esq.
    1400 16th Street
    Denver, Colorado  80202

**FOR GARRISON INVESTMENT GROUP:**
    Brent R. McIlwain, Esq.
    1801 California Street, Suite 5000
    Denver, Colorado  80202

**FOR MONARCH NATURAL GAS LLC:**
    David M. Rich, Esq.
    650 South Cherry Street, #1100
    Denver, Colorado  80246

**FOR XTO ENERGY INC.:**
    Duncan E. Barber, Esq.
    4582 South Ulster Street, #1650
    Denver, Colorado  80237

**FOR DORRIER EQUITIES LTD. AND MARKHAM LLC:**
    Ellen Arvin Kennedy, Esq.
    250 West Main Street, #1400
    Lexington, Kentucky 40507


    Proceedings electronically recorded and produced by
Federal Reporting Service, Inc.

_____

Requested By: Diamond McCarthy   FEDERAL REPORTING SERVICE, INC.
LLP                              17454 EAST ASBURY PLACE
Ordered:  10/25/17               AURORA, CO  80013
Delivered: 10/31/17              (303) 751-2777
Time: 7 day
$4.25 per page: $216.75

1              P R O C E E D I N G S

2          THE COURT:  Thank you.  Be seated, please.

3          All right.  We are on Case Number 17-17465, Badlands

4  Energy Inc. and related cases, and we're here on the sale

5  motion.

6          May I have appearances, please?

7          MR. HARTL:  Good morning, Your Honor.  Ted Hartl,

8  here on behalf of all the debtors in these cases.  With me at

9  counsel table is Mr. Rich Langdon, the debtors' CEO.

10          THE COURT:  Thank you.

11          MR. LEE:  Good afternoon, Your Honor.  Kyung Lee,

12  L-E-E, and Charles Rubio, R-U-B-I-O, with the law firm of

13  Diamond McCarthy LLP; and we represent the purchaser, Wapiti

14  Newco Utah, LLC.

15          THE COURT:  Thank you, Mr. Lee.

16          MR. AYER:  Good morning, Your Honor.  Mitchell Ayer

17  and Steve Levitt of Thompson and Knight.  We represent Wapiti

18  Oil and Gas II, or called WOG II.  They are roughly a 50

19  percent working interest owner in the assets being sold today.

20          THE COURT:  Thank you.

21          MR. SWANSON:  Good morning, Your Honor.  Tim Swanson

22  from the law firm of Moye White, representing Halliburton

23  Energy Services Inc. and Multi-Chem Group LLC, a lien claimant

24  against the debtors' assets to be sold.

25          THE COURT:  Thank you.

1           MR. MCILWAIN:  Good morning, Your Honor.  Brent

2   McIlwain here from Holland and Knight, here for Garrison, the

3   DIP lender and prepetition lender.

4           THE COURT:  Thank you.

5           MR. RICH:  David Rich on behalf of Monarch Natural

6   Gas.

7           THE COURT:  Thank you.  Good morning.

8           MR. BARBER:  Duncan Barber on behalf of XTO.  My

9   issue has been resolved.  I probably will leave before the

10  hearing is over.

11          THE COURT:  Fair enough.

12          MR. BARBER:  Thanks.

13          THE COURT:  Thank you, Mr. Barber.

14          MS. KENNEDY:  Good morning, Your Honor.  Ellen Arvin

15  Kennedy, Dinsmore and Shohl, representing Dorrier Equities.

16          THE COURT:  Thank you, Ms. Kennedy.

17          Anyone else?  Do we have anyone on the phone?

18          SPEAKER:  No.

19          THE COURT:  All right.  Mr. Hartl.

20          MR. HARTL:  Thank you, Your Honor.  We're here on the

21  debtors' motion to sell substantially all assets of one of the

22  four debtors; that's Badlands Production Company, what's known

23  as the Riverbend Asset.  The sale motion has been pending in

24  this case since it was filed on August the 14th, a few days

25  after the petition date.

1          There was a stalking horse bid that was entered into

2     and a PSA, Purchase and Sale Agreement, entered into shortly

3     before the purchase--excuse me--before the petition date to

4     sell to ultimately who turned out to be the prevailing bidder

5     after an auction process.

6          There are several objections and related adversary

7     proceedings that have been filed per the docket.  I think what

8     I'd like to do with the Court's indulgence is sort of just tick

9     off the objections and how I think they've been resolved and

10    what's left for evidence and for the hearing this morning

11    before launching into an opening statement and otherwise

12    putting a witness on the stand.

13          THE COURT:  I think that makes good sense.

14          MR. HARTL:  The sale objections were drawn and filed

15    by Wapiti Oil and Gas II, the WOG II entity, represented by Mr.

16    Ayer and Mr. Levitt.  Those are at Docket, I think, 112 and

17    182, two sale objections.  There is also a related adversary

18    proceeding commenced by WOG II; that's 17-1377-KHT.

19          Objection also from Monarch Natural Gas, Mr. Rich's

20    client, two objections substantially the same at Docket Number

21    109 and 194.

22          Objection--also a related adversary proceeding--

23    excuse me--commenced by Monarch just recently; that's

24    17-1429-KHT.

25          Objections to the sale from Halliburton, Mr.

1    Swanson's client; 198 docket number is the sale objection.

2    There is also a cure objection that relates to it, Docket

3    Number 114.  Halliburton has also filed an adversary proceeding

4    just recently; that's 17-1427-KHT.

5            Dorrier Equities and Markham filed their objection to

6    the sale at Docket Number 206; no adversary proceeding for

7    those entities.

8            And XTO, Mr. Barber's client, filed a cure objection

9    at Docket Number 193.

10           I think--and I'll go into more detail here in a

11   minute, but I think all except for the Dorrier-Markham

12   objection have been resolved by a negotiation of a form of sale

13   order that we're prepared to tender to the Court.  We have the

14   redline designated as an exhibit against the originally filed

15   sale order back from August so that the Court can see all of

16   the changes.  But I think for purposes of today we're going to

17   be left with business judgment, good faith of the buyer, and

18   standard 363(b) and 363(f) issues that the debtors will present

19   evidence on.

20           As to the WOG II objections and adversary proceeding,

21   the terms of the negotiated sale as a result of the auction are

22   that the buyer has committed now to pay any and all cure

23   amounts associated with the WOG II contract and the WOG II

24   litigation and will be substituting in as the real party in

25   interest after closing with respect to all those disputed lien

```
 1    claims, disputed cure amounts.  In--
 2             THE COURT:  Will--
 3             MR. HARTL:  Go ahead.
 4             THE COURT:  Will that come out of the amount, the bid
 5    amount, or is that on top of the bid amount?
 6             MR. HARTL:  Here is how it works.  The stalking horse
 7    initially was that it would come out of the sale proceeds or
 8    the debtors would be obligated for it.  As a result of
 9    negotiations in the auction process, it is now on top of the
10    sale proceeds.
11             THE COURT:  Yes.
12             MR. HARTL:  The WOG II claims also involve a claim
13    that the contract operating rights of the debtor terminated
14    prepetition.  The sale is subject to that pending claim too, so
15    the buyer knows that there is a dispute as to who the operator
16    might be.  The negotiated terms of the sale order provide that,
17    if it's ultimately determined that WOG II is the proper
18    operator, the buyer will turn over operations as reasonably
19    probable--possible--excuse me.
20             Same basic result for the Monarch litigation.
21    Monarch's claim concerning its midstream gathering
22    transportation contracts are that those cannot be rejected, and
23    there are covenants running with the land.  The negotiated sale
24    terms are similar to the WOG II result, and that is the buyer
25    has agreed to take at least subject to that pending litigation
```

1    and the outcome of that litigation.

2           To be clear, the debtors are not assuming and

3    assigning the Monarch contract to the buyer, and they're not

4    stepping into the debtors' shoes under the contract, but simply

5    taking to whatever the outcome of that litigation might be.

6           If it's ultimately determined by this Court or

7    another Court of competent jurisdiction that the Monarch

8    contract is a covenant, then the buyer is going to be stuck

9    with it.  If it's ultimately determined that it's a contract

10   that couldn't be rejected and that there are cure amounts

11   associated with that contract or prepetition amounts which are

12   over a million dollars or so, the buyer is going to have to

13   pay.  But it's all subject to a determination outside of the

14   sale agreement.

15          THE COURT:  All right.

16          MR. HARTL:  As to Halliburton, the lien/cure

17   objections have been likewise resolved by the form of order.

18   Any disputes as to--and these are more traditional mechanic's

19   liens started against the property.

20          There is also a historical joint operating agreement

21   that Halliburton was a party to.  It's the debtors'

22   understanding that Halliburton no longer has any interest under

23   that JOA, and so the true claim is the mechanic's lien claim

24   from a master services agreement for work in the field.  That's

25   where roughly $800,000 of their claim comes from.

1        And the way that'll be resolved is that the sale

2   proceeds will remain in the debtors' possession post-closing

3   with the liens to attach pending a determination of the

4   extendibility (phonetic) and priority of liens, sort of a more

5   traditional bankruptcy issue.  It probably couldn't stay in

6   this Court.

7        With respect to XTO, the debtors have agreed and

8   stipulated to a cure amount of just shy of $30,000 of the

9   condition of assuming and assigning that contract.  It's built

10  into the amendment as a schedule to the sale order, and it also

11  tweaks in additional amounts that may accrue between today and

12  the closing date.  So those are, under the PSA, a deduct from

13  the sale proceeds, but they are not material.

14       The other issues that were raised informally at prior

15  hearings from the federal agency, the EPA being the last one

16  that the Court heard from, concerning some wetlands and some

17  fish habitat in the area have likewise been incorporated into

18  the form of order.  That's why you haven't seen an objection

19  from those parties.

20       Similar to the BLM and the ONRR with respect to

21  federal leases, there is a cure amount associated with those.

22  The debtors were working on confirming the amount that will be

23  a deduct from the sale proceeds under the PSA.  But, again, we

24  don't believe those to be material, probably on the order of

25  $25,000 or so.

 1           So that leaves us with the Dorrier-Markham objection

 2   to the sale for today.  And I don't know when the appropriate

 3   time would be to hear from other parties as to whether or not

 4   what I'm saying is true.

 5           THE COURT:  Why don't I hear from other parties, and

 6   then we'll get down to the debtor/Dorrier dispute?

 7           MR. HARTL:  Thank you.

 8           THE COURT:  Mr. Ayer.

 9           MR. AYER:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MR. AYER:  Mr. Hartl correctly summarized WOG II's

12   position on this.  WOG II is roughly a 50 percent working

13   interest owner.  They have been in longstanding dispute with

14   Badlands about overcharging them for non-producing wells,

15   marketing fees, not remitting money to Monarch, not paying

16   quarterly volume commitments saved (phonetic) to Monarch.

17           And WOG II also has an operator's lien of record

18   securing these amounts.  And WOG II also terminated a contract

19   operating agreement prepetition, and the debtor disputes that

20   it was probably terminated.

21           Anyway, the buyer, Wapiti Newco/Wapiti Utah, has

22   agreed to assume the amounts of these cures, and the sale order

23   has provisions in it recognizing kind of the mechanics on how

24   the cure payments are going to be made, and if it's not

25   resolved by agreement, going back for an adversary, and how the

1    buyer is going to substitute in for Badlands in the current

2    adversary.

3            And so the language in the sale order has resolved

4    WOG II objections to sale.

5            THE COURT:  Thank you.

6            Mr. Rich.  I'm just going through them as they have

7    come up.

8            MR. RICH:  Fine, Your Honor.  Thank you.

9            Thank you, Your Honor.  Monarch opposes sale, because

10   we have a gas gathering agreement and a saltwater disposal

11   agreement that we believe runs with the land, and under law it

12   can't be rejected.  It has to be either assumed or it's a

13   covenant running with the land.

14           And so we hold a--to that position.  We have filed an

15   adversary proceeding, and I would like to say we object to the

16   sale.  And you would say, Mr. Rich, your arguments are coherent

17   and persuasive, but this is not the place to have it; it'll be

18   in the adversary proceeding.

19           THE COURT:  Right.

20           MR. RICH:  And the order, as Mr. Hartl has recited to

21   the Court, adequately, I think, takes care of Monarch's

22   position; that is, that the sale is subject to the adversary

23   proceeding, and that's the proper place where our dispute

24   should be heard.

25           THE COURT:  All right, thank you.

1       Mr. Swanson.

2       MR. SWANSON:  Good morning, Your Honor.  Our key

3   issue with the sale, I believe, has been resolved by the

4   debtors' proposed form of sale order and representation here in

5   court that no sale proceeds be distributed unless and until

6   this Court has made a ruling with respect to the lien priority

7   issues against those proceeds and also that all rights and

8   claims, defenses, etc. are reserved in whatever proceeding that

9   may be.  And I believe the sale order accomplishes that, and

10  Mr. Hartl's representation is accurate.

11      Regarding our cure objection, the debtors sought to

12  assume and assign--are seeking to assume and assign a joint

13  operating agreement.  We filed a protective cure objection,

14  because our claim arises out of some vendor services agreements

15  or master services agreements.  We couldn't quite tell whether

16  they're related to that joint operating agreement.  We don't

17  think they are.  The debtors would acknowledge that they're

18  probably not, and I think we're all good on that issue as well,

19  given that our rights under our vendor services and master

20  services agreements are reserved as well.

21      THE COURT:  All right.

22      MR. SWANSON:  Thank you.

23      THE COURT:  Mr. Barber.

24      MR. BARBER:  Good morning.  We filed a cure objection

25  that's been resolved.  The form of order I saw yesterday was

1   acceptable, so I think we're taken care of.

2            THE COURT:  Very good.

3            MR. BARBER:  Thanks.

4            THE COURT:  All right.  Mr. Lee.

5            MR. LEE:  Yes, Your Honor.  Kyung Lee for the

6   purchaser.  Two points.  Number one is, there is an urgency

7   with respect to closing of this transaction, as I understand

8   it.  The debtor is not going to have DIP financing after the

9   end of this month.  The purchaser has been working away to

10  getting all the things ready to close this transaction within

11  the next six days, and we're working on that right now.

12           Secondly, Your Honor, we feel that this process,

13  which started with the debtor in February of 2017 and the

14  retention of Parkman Whaling in March of 2017 and exposure of

15  the assets to the market for quite some time, not just since

16  the bankruptcy, I think, should persuade this Court that these

17  assets have been marketed, that we're a logical buyer, we are

18  the highest buyer, and we're prepared to close.

19           Thank you, Your Honor.

20           THE COURT:  Thank you, Mr. Lee.

21           All right, then I don't think--was there anyone here

22  from the EPA or BLM?

23           All right.  Sounds like things have gotten resolved--

24  go forward with the sale order.  Why don't we get to the

25  dispute that exists at this point?

1            MR. HARTL:  Thank you, Your Honor.  That whittles us

2    down to one substantive objection to the sale from Dorrier

3    Equities and Markham.

4            If the Court will recall from some of the first-day

5    hearings in this case, there are two shareholders of the debtor

6    parent, Badlands Energy Inc.  Those two shareholders are the

7    objecting parties, Dorrier and Markham.  They are also

8    unsecured creditors in their own right, having funded the

9    debtor's operations on an unsecured basis along the way.

10            The complaints from Dorrier--and I'll just refer to

11    them combined as Dorrier for simplicity, if you will.  The

12    complaints from Dorrier echo those that were made in objections

13    to the bid procedures for the Riverbend assets of Badlands

14    Production; that is, that the sale is moving too fast, that

15    they haven't been adequately marketed, that the sale is not in

16    the best interests of the debtor or the estate or a sound

17    exercise of the debtor's business judgment.

18            There is also an objection now questioning the good

19    faith under the 363(m) of the buyer.  Dorrier is closer to

20    these debtors and these assets than your typical unsecured

21    creditor.  And, in fact, Dorrier was on the board.  Markham had

22    a board representative prepetition.

23            And the evidence will be today that not only is this

24    transaction in the best interests of the estate in the exercise

25    of the debtor's business judgment, but that both Dorrier and

1    Markham voted in favor of the transaction that's being approved

2    today, even a slightly worse transaction from the debtor's

3    perspective given the changes in the resolution of the

4    litigation.

5          So it's a bit of a head-scratcher for the debtor why

6    folks who sat on the board and voted in favor of this

7    transaction are now turning around and objecting to it as not

8    an exercise of the same business judgment that was exercised

9    prepetition.  But, nevertheless, the debtors are prepared to

10   present evidence and testimony consistent with the business

11   judgment standard in this circuit and elsewhere.  And this

12   dates back to the line, okay, it's out of the Second Circuit.

13         The factors the Court considered and that the

14   evidence will support today are that, you know, there's no

15   improper or bad motive behind the debtors' efforts to sell.  I

16   think the history that you'll hear from Mr. Langdon about how

17   the debtors wound up in Chapter 11 will be evidence that this

18   was really the best thing the debtors could do under the

19   circumstances given their capital structure, their loan

20   defaults, and where they are headed with these assets otherwise

21   outside of bankruptcy.

22         Second factor is whether the price is fair, and the

23   negotiations have been at arm's length.  I think the evidence

24   will support that as well, Your Honor.

25         Mr. Bruce Campbell from Parkman Whaling is here to

1   testify as a witness about the marketing process since his

2   engagement in March of this year.  Mr. Langdon will testify

3   some as to the prepetition efforts to sell these assets or

4   otherwise dispose of them.

5        And that ties into the third factor under the case

6   law, and that's the adequate sale procedures and market

7   exposure.  I think the evidence will support that despite

8   Dorrier's objection.  And the evidence will be, Your Honor,

9   that more time isn't going to help the situation here.  And, in

10  fact, it may interject more risk.  These are depleting assets

11  by their very nature.  The market value is not going anywhere

12  but down given the depletion in the assets unless you want to

13  speculate that gas prices are going to come back.  And Chapter

14  11 debtors typically aren't in the business of speculating on

15  where commodity prices might go.

16        THE COURT:  Oh, I think they do it all the time.

17        MR. HARTL:  That's fair.

18        At the end of the day the debtor's business judgment

19  is subject to significant deference under the case law.  The

20  Court shouldn't supplant its judgment for that of the debtor's

21  if all the factors under the case law are met otherwise.  And

22  at the end of evidence, Your Honor, I think you'll be led to no

23  other conclusion than that the sale should be approved.

24        As to timing, the deal point for a closing with the

25  buyer is not just dictated by Garrison, the secured lender

1   here, to be sure that the DIP financing had some aggressive

2   timelines in it and some covenants that are fairly aggressive.

3   Again, those were signed off by both Dorrier and Markham

4   prepetition when they were on the debtor's board.

5          But Garrison is not the sole arbiter of those

6   deadlines.  The closing date of 10/31 here coming up was a

7   negotiated deal point with the buyer, and we've done our best

8   to both market the assets appropriately under the circumstances

9   and meet those deadlines to maximize value here.

10         I think given the agreements with the other parties

11  asserting liens and other claims, 363(f) is satisfied.  We've

12  got consents from Garrison, consents from Halliburton.  The

13  liens are going to attach to the sale proceeds, and the

14  proceeds are sufficient to cover those liens.  The WOG II lien

15  claims are going to be the obligation of the buyer.  The

16  Monarch claims will be the obligation of the buyer to the

17  extent that they're proven up.

18         So, overall, at the close of evidence this morning,

19  the debtors are going to ask that you enter the sale order in a

20  form that we'll tender consistent with the redline that's been

21  negotiated over the last several weeks with the parties in

22  interest.  Thank you.

23              THE COURT:  Thank you.

24              Ms. Kennedy.

25              MS. KENNEDY:  Thank you, Your Honor.  Ellen Arvin

1   Kennedy, Dinsmore and Shohl, representing Dorrier Equities and

2   Markham Holdings.  I'll refer to them as Dorrier as well.

3         Your Honor, I would like to start with just a

4   housekeeping matter.  I did get an extension to file my

5   objection until Friday, so it was not late.  I noted that that

6   was one of the Wapiti II's responses to my objection, and I--

7         THE COURT:  And I knew that, so I--

8         MS. KENNEDY:  Okay.

9         THE COURT:  --I was well aware you timely filed.

10         MS. KENNEDY:  All right, thank you.

11         Your Honor, before we get into taking evidence, I

12   would like to note--and I say this not with criticism, but in a

13   different--a different reaction, I believe, to the objection

14   that was filed by Dorrier, unlike some of the other objecting

15   parties that have had conversations with the debtor or Garrison

16   or other parties in an attempt to resolve their objections

17   prior to this hearing, I have had no conversations with Mr.

18   Hartl until this morning in the elevator.

19         I do think that in light of the changes to the

20   proposed sale order that has just been put into the record, as

21   well as my understanding of how the Monarch claim is going to

22   be treated and some other things, it may be beneficial, if Your

23   Honor please, that we have a brief opportunity to speak before

24   launching into a more lengthy series of testimony and

25   testifying and the introduction of exhibits to see if we can

1  narrow the issues as to what it is I think the parties are here

2  to do today.  And I'll put that up for your consideration.

3       Your Honor, the Dorrier parties here are unsecured

4  creditors in their own right.  They are shareholders; they have

5  served on the board; they are familiar with the assets of the

6  debtor.  Those facts do not undercut or otherwise eliminate

7  their rights as unsecured creditors to view the process that is

8  happening here and to raise objections as necessary.

9       The case does not have an unsecured creditors'

10  committee, and it seems as though, in the absence of that

11  committee, there isn't much in the way of oversight in terms of

12  how the debtor and the secured lender are reacting to each

13  other.  And some of those issues and concerns of Dorrier on

14  behalf of themselves and other unsecured creditors are a part

15  of why there is an objection to the sale.

16       The Dorrier parties, unlike Mr. Hartl's statement, do

17  not object to the fact that the assets need to be sold.  That's

18  not a point that they are making, nor is it necessarily the

19  timing, although there was concern that the timing was too

20  fast.  The Court set the dates.

21       The primary concern related to the sale as it came

22  down is that there is really no--there was not a lot of

23  transparency in the process, even in the report of auction, as

24  to how the Wapiti II bid was deemed to be highest and best by

25  virtue of the fact that--I mean, Wapiti Newco's bid was deemed

1   to be highest and best by virtue of Wapiti II's waiver of its

2   claims.

3         It is unbelievable that, in the absence of a winning

4   Wapiti Newco bid, Wapiti II would release those claims, and

5   Garrison would be faced with challenging--with lien challenges

6   and other issues, putting a face value on that without any

7   evidence in the record or any support as to the value of that.

8   Even in the report of sale there is no value to that.

9         But effectively pricing out Monarch to even bid again

10   raises some concern.  This is a case where the assets are

11   heavily secured.  There is a large debt to Garrison here, and

12   every penny counts.

13         Dorrier is raising its hand now, because the parties

14   are in a Chapter 11.  The debtor has an obligation to look to

15   all of the constituents in the case.  It can't just please the

16   secured lender.  This can't be just a two-party--it can't be

17   just a two-party case.

18         And in allowing sales to go through without raising

19   objections, without asking for the relief that we request in

20   our objection that sale funds be escrowed so that at the end of

21   the case there is some administration of claims that, you know,

22   give some nod to the other creditors in the case, we have

23   concerns about the case going through and the sale being

24   confirmed without any of those protections in place.

25         So I am ready to proceed as Your Honor deems

1    appropriate but willing to talk to the parties briefly before

2    we launch in.

3             THE COURT:  All right.

4             MR. MCILWAIN:  Thank you, Your Honor.  Brent McIlwain

5    here from Holland and Knight for Garrison.

6             One thing I just wanted to correct, and I think this

7    was an oversight.  Mr. Hartl said Garrison is at $38.8 million,

8    somewhere thereabouts, and the sale proceeds are certainly not

9    sufficient to cover Garrison and Halliburton's asserted lien.

10   So there is going to be a substantial deficiency claim.

11            The other issue, Your Honor, that has been raised is

12   that this is just really being run for Garrison's benefit.

13   We've got Monarch; we've got Wapiti II; we've got other

14   creditors; we've got XTO.  We've got a number of other

15   creditors that are being paid, that their rights are being

16   preserved.  This certainly is not a Garrison--you know,

17   Garrison gets all the proceeds at this point, because that's to

18   be determined.

19            Now, I would say, the idea that we're going to sell

20   these assets for a third of our debt and then there should be

21   some nod to unsecured creditors that are subordinate,

22   specifically subordinate, is something I'm not obviously going

23   to agree to.  And I would say on the record that's--I don't

24   think that would be appropriate.

25            But at this point, Your Honor, I think that this sale

1  process has really brought together and resolved a number of

2  issues that the debtor had; and it's not just for Garrison's

3  benefit.

4         THE COURT:  Mr. Hartl, does it make sense for you and

5  Ms. Kennedy to have a few minutes to speak to narrow the issues

6  of what we need to have evidence on this morning?

7         MR. HARTL:  Yeah, I think that--

8         THE COURT:  It strikes me that it does, but--

9         MR. HARTL:  Yeah, that's always a good idea in our

10 view if we want to take five or ten minutes to see what the ask

11 is and whether there are additional protections beyond just

12 reserving the sale proceeds that might satisfy the Dorrier-

13 Markham problem.

14        THE COURT:  All right.

15        MR. HARTL:  The reasons this has been fast and

16 furious, you know, we certainly didn't mean to exclude Dorrier.

17 We viewed their objection as different in tenor and amount and

18 unresolvable as a practical matter other than us having to

19 prove our prima facie case, which is what we're here today to

20 do.  You know, the remarks that there isn't evidence about why

21 this is the highest and best offer are sort of why we're here

22 today; and we're prepared to go forward.

23        But if you want to take a brief recess, I'm happy to

24 see if there is a resolution to be had.

25        THE COURT:  Well, at least now what we need to hear

```
 1   today.
 2              MR. HARTL:  Certainly.
 3              THE COURT:  That probably makes sense.
 4              Why don't we take a 15-minute break; 10 of 11:00
 5   we'll look at coming back in?  All right?
 6              SPEAKER:  Thank you, Your Honor.
 7              THE COURT:  Thank you.
 8         (Recess at 10:32 a.m. until 10:50 a.m.)
 9              THE COURT:  Thank you.  Be seated.
10              All right.  Any progress?
11              MR. HARTL:  I think so in the sense that the debtors
12   certainly have a better understanding of where the Dorrier-
13   Markham parties are coming from.  And, you know, we're still
14   prepared to go forward today, whether it's on an offer-of-proof
15   basis or with evidence.
16              I don't think, having spoken to counsel for Dorrier,
17   that they are objecting or standing in the way of this sale per
18   se, because the alternative is a thumbs-up or a thumbs-down.
19   And I don't think they are in support of a thumbs-down at this
20   point.  And certainly Ms. Kennedy can speak for herself.
21              THE COURT:  I thought I would let her.
22              MR. HARTL:  The broader point of the objection--and
23   it's a fair one, and it also ties back to the bid procedures
24   objection that they filed, and that was a fair one too--that
25   there was a broader question about whose benefit these Chapter
```

1   11 cases are being run for and what's the end game here once

2   these sales are done.

3           And, unfortunately, the debtors can't deliver a

4   promise of payouts to unsecured creditors when the assets are

5   encumbered by $35 million of secured debt and lien claims on

6   top of it.  What we've tried to do is pick off creditors and

7   weasel some benefits, if you will, where we can, but

8   understanding that there is a broader constituency of unsecured

9   creditors that are not at the table that do not have the

10  leverage to negotiate for themselves, because there's not a

11  committee here.

12          And so I think that's the broader point that the

13  Dorrier objection is making, and it's not lost on the debtors.

14  And if we get to a plan confirmation process, we're going to

15  have to probably demonstrate some benefit to the estate overall

16  and benefit the creditors here.  But from the debtors'

17  perspective, that's not teed up for today.  It's not an issue

18  that's ripe for evidence today, but it's certainly a fair

19  question to be raised in any Chapter 11 case.

20          So, you know, with that, I'm prepared to put our

21  witnesses on.  I'm prepared to make a more detailed offer of

22  proof and tender the exhibits, however you want to proceed

23  after Ms. Kennedy has a chance to speak to our discussion.

24          THE COURT:  Ms. Kennedy.

25          MS. KENNEDY:  Thank you, Your Honor, and thank you

1    for the opportunity to get a chance to talk with debtors'

2    counsel.  I do think it was helpful, and I do think that we

3    made some progress in terms of understanding where each of our

4    respective parties are coming from.

5            As Mr. Hartl said, there are irregularities and

6    questions about how the auction was conducted that we had set

7    forth in our objection.  Dorrier does have concerns about how

8    the auction played out, but at the same time realizes that the

9    assets do need to be sold and is not standing and falling so

10   much on whether or not this sale can be confirmed, but did not

11   want to lose the opportunity or later be told that in the

12   absence of raising our hands early and often in relation to how

13   these sales are proceeding, how it--it certainly appears from

14   the outside--more or less outside looking in--that this is a

15   case and a series of transactions that are being done

16   specifically for the benefit of the secured creditor without an

17   eye toward anyone else.

18           That is the thrust of our objection here, and we

19   didn't want later to be told, If you'd had a problem, you

20   should have said something earlier on.  And so that's part of

21   where we are coming from, and I think we better understand each

22   other after having an opportunity to talk about that.

23           This is a Chapter 11 case in which there needs to be

24   some pay-to-play.  There needs to be an eye toward all of the

25   constituencies.  The attorney who is here for Garrison

1    obviously sees things differently, because he is looking at his

2    secured position against assets that so far have not yielded

3    sufficient monies that we all have, you know, an easy eye

4    toward where there is going to be some payout.

5              THE COURT:  Sure.

6              MS. KENNEDY:  I understand his position, but at the

7    same point I do want to continue to ring the bell certainly in

8    the absence of a committee that there needs to be an eye toward

9    all of the constituents in the case.  And if that is not the

10   case, then, you know, this isn't the forum where these things

11   need to be happening.

12             So if Mr. Hartl wants to proffer his testimony as to

13   the sale process, that's okay with Dorrier for purposes of

14   getting evidence in the record.  We do stand on our objection,

15   but understand that one of the asks in our objection will be

16   resolved in a way that is acceptable to us, and that is that

17   proceeds would be put into escrow until further order of the

18   Court and that would give any--you know, every party

19   opportunity to object prior to any money going out the door,

20   because we do think that, especially in a case of limited

21   resources, there needs to be some marshalling of those assets

22   with an eye toward a benefit of all of the creditors in the

23   case.

24             Dorrier has consistently been looking at the

25   deadlines and looking at the speed and raising their hands in

1    concern about how quickly things are going.  To some extent,

2    from a practical perspective, we understand that there's

3    closing deadlines, there's financing deadlines.  We are not

4    trying to overcome that simply to prove a point, but we do want

5    to continue to point that out to the Court as, you know, a

6    basis of concern if we get to the end of the case, running

7    pell-mell at the agitation of the secured lender, without an

8    opportunity to really maximize in a way that is beneficial to

9    all.

10           So that's where we are right now.

11           THE COURT:  And that certainly is a concern of the

12   Court.  I think at the very first hearing there was a concern

13   that this was moving awfully fast.  We ended up having to slow

14   things down.  The hurricane helped us, unfortunately.

15           But obviously I'd like to see these assets maximized,

16   but I also--I am interested as to how much marketing did go on

17   prior to the bankruptcy being filed, because I think that does

18   have to be taken into account.  I know there was a concern that

19   there was no way to lump the assets together, the gas and oil

20   assets together as a package, but I'm not seeing anybody coming

21   forward saying, And I want all of it, and I'm going to be

22   paying lots more.

23           So I--this is one of those horrible cases--and most

24   Chapter 11s are--where you have the 800-pound gorilla in the

25   form of a secured creditor.  And it would be nice if we had

1   more assets, more ways of getting more funds.

2        I would like to have some understanding of how you

3   determined the highest and best, especially in light of the

4   fact that we don't have a number for Wapiti II's claim.  So how

5   is it that that was determined to be the highest and best with

6   them adding that and the chilling aspect that may have had on

7   other bidding.  But, of course, there were these two parties at

8   that point.

9        MS. KENNEDY:  Right.

10        THE COURT:  So I would like to have an understanding

11   of how that went through.  If you are comfortable with the

12   proffer, I'm comfortable with the proffer; but I'm also happy

13   to listen to evidence as well.

14        MS. KENNEDY:  I'm comfortable with the proffer.  If I

15   do have any questions, I'll certain raise them if I feel that

16   there is something that has not been covered or might better be

17   served with evidence.  But I'm willing to listen to the proffer

18   and see where we go from there.

19        THE COURT:  All right, why don't we start with that;

20   and then if we have problems we'll take live testimony.

21        MR. HARTL:  Okay.  I will do my best to put words in

22   the witnesses' mouths.  And if it's--

23        THE COURT:  That's what we love to do as lawyers, put

24   words in other people's mouths.

25        MR. HARTL:  Bankruptcy lawyers especially.  In other

1    courts, they don't get away with it.

2         For the record, Your Honor, you should have an

3    exhibit book in front of you.  The small one is the debtors'

4    exhibits.

5         THE COURT:  Yup.

6         MR. HARTL:  And we've numbered those 1 through 5.

7    Consists of three sets of board minutes.  One, contact list is

8    Exhibit 4 from Parkman Whaling.  And then just for the Court's

9    edification, the redline of the proposed sale order against the

10   initial order.  Unless there are any objections to the

11   admission of those, I'd just go ahead and move those into the

12   record at this time.

13        THE COURT:  Ms. Kennedy, any objection to the five

14   exhibits?

15        MS. KENNEDY:  No, Your Honor.

16        THE COURT:  Thank you.

17        All right, they will be admitted.

18      (Debtors' Exhibits 1 through 5 were received in evidence.)

19        MR. HARTL:  You also have a larger book in front of

20   you that are Wapiti Utah formerly known as Wapiti Newco's

21   exhibits.  I believe it's 1 through 32.

22        THE COURT:  Yes.

23        MR. HARTL:  For the record, those consist of the

24   stalking horse purchase agreement, the well lists, the material

25   contracts that are related to the sale, additional

1   correspondence with the federal agencies concerning their

2   claims and resolutions, as well as some corporate documents

3   related to the purchasing entity.  I would go ahead and move

4   the admission of those exhibits into the record as well.

5          THE COURT:  Ms. Kennedy?

6          MS. KENNEDY:  No objection.

7          THE COURT:  Thank you.

8          All right, they will be admitted as well.

9    (Wapiti Utah's Exhibits 1 through 32 were received in

10  evidence.)

11         MR. HARTL:  And I don't think I have any other

12  exhibits besides those.

13         THE COURT:  I think that covers everything on my

14  desk.

15         MR. HARTL:  Okay.  May it please the Court, if Mr.

16  Langdon were to testify and be called as a witness, his

17  testimony would essentially be that he's the debtors' CEO and

18  has been for some time.  Consistent with his testimony at the

19  first-day hearing, the debtors are essentially operated as one

20  business together, the parent company being Badlands Energy

21  Inc., and its wholly owned subsidiaries, Badlands Production

22  Company, Badlands Energy-Utah LLC, and Myton Oilfield Services.

23         What we're here today on is the sale, as I mentioned

24  at the outset, of the Badlands Production assets; and those are

25  known as the Riverbend Assets.  Within a few weeks we'll

1   probably be back here on the sale of the South Altamont assets

2   of the other subsidiary debtors.

3        THE COURT:  That's going to an auction tomorrow in

4   Judge Romero's courtroom?

5        MR. HARTL:  Correct.  And we have five bidders, five

6   qualified bidders, for that one.  So maybe it'll be a little

7   prettier picture.

8        Mr. Langdon testified that the two shareholders of

9   the parent company are Markham and Dorrier.  They were both on

10  the board prepetition.  He also testified that the Riverbend

11  assets consist of approximately 140 natural gas-producing wells

12  in the Uintah Basin in Utah.  They produce roughly six to seven

13  million Mcf a day, I think

14       SPEAKER:  (Inaudible) about 15 to 16 million

15  (inaudible).

16       MR. HARTL:  Okay.  So hauling in about 15 to 16

17  million cubic feet of gas per day.  They are depleting assets

18  by their very nature.  You take the gas out of the ground, it

19  doesn't replenish itself, so it's a wasting asset, is what the

20  evidence will be.

21       Mr. Langdon also testified about the events leading

22  up to these Chapter 11 cases, including the debt structure

23  currently in place, a senior secured loan owed to Garrison of

24  somewhere on the order of $35 million.  His testimony will be

25  that the loan has been in default since the second quarter of

1   2016.  There haven't been any payments made to Garrison since

2   that time, but the debtors have stayed alive through the use of

3   cash collateral.

4          Mr. Langdon's testimony will be that the Riverbend

5   assets in particular, in contrast to the South Altamont assets,

6   are troubled assets.  They have real difficulties on top of the

7   debt that is encumbering them, and those difficulties arise

8   from the midstream contracts, the gas gathering and

9   transportation agreements, and the saltwater agreements, with

10  removal agreements with Monarch being one of them; also

11  difficulties with Chipeta and Questar for the same midstream

12  issues.

13         And the problem really is this:  Those contracts

14  require certain payments, minimum volume commitments to be

15  placed in the transportation lines, and at current market

16  prices the debtors just can't fulfill their obligations under

17  those contracts.  Efforts to renegotiate the terms and to get

18  those contracts more in line with what the market prices have

19  been for the past several years have been unsuccessful, as have

20  development efforts in the basin.  Given gas prices, it's

21  simply not economical to drill new wells out there.

22         So those two pincers on the debtors' operations with

23  respect to Riverbend, in addition to the debt defaults to

24  Garrison, led them to pursue some kind of restructure or a sale

25  of assets.  Mr. Langdon's testimony would be that these efforts

1  began back in 2016.  They engaged Simmons and Company as a

2  financial advisor to help them identify someone who might

3  engage in a restructure transaction, some new financing.  Sale

4  of assets were explored.  The board of directors, including

5  Dorrier and Markham, were involved in the process regularly

6  and, in fact, put some late money in on an unsecured and

7  subordinated basis to help the debtors get through the process.

8          Ultimately, the Simmons engagement did not bear any

9  fruit that was acceptable to the constituents, Garrison being

10  the principal concern; and the debtors shifted gears and hired

11  Parkman Whaling in the spring of this year.  In March the board

12  approved Parkman Whaling's engagement, and that's reflected in

13  the minutes that are the Debtors' Exhibit 1.  The board vote

14  was unanimous, including the Dorrier and Markham parties.

15          Parkman Whaling immediately undertook to evaluate the

16  debtors' assets.  And if called to testify, Mr. Bruce Campbell

17  from Parkman Whaling would confirm Parkman Whaling's engagement

18  in the spring of this year, their immediate setting up of a

19  virtual data room with material contracts and information that

20  they, as investment bankers and oil and gas marketing

21  professionals, typically use in non-bankruptcy transactions.

22          This includes technical data concerning the wells;

23  updating the reserve reports about what the gas in the ground

24  looks like and what's expected, both based on recent production

25  and projections; marketing contracts, some of these troubled

1   midstream contracts; land records for developed and undeveloped

2   acreage to the extent there was any; and lease operating

3   expense information so the bidders and potential investors

4   could have a full picture of what these assets look like from a

5   production basis and potential value down the road.

6          Exhibit 2, Your Honor, reflects a further board call

7   just a week after Parkman Whaling was engaged.  They were

8   setting up the data room and moving quickly to get these assets

9   to market.

10  Mr. Campbell's testimony would be, Your Honor, that they went

11  live to market to potential buyers on April the 19th of 2017.

12         Their prepetition marketing efforts in this year,

13  putting aside Simmons' prior efforts, involved contacting 70

14  potential bidders, interested parties, across the country; that

15  these assets were, in fact, packaged together with the South

16  Altamont assets so that all of the debtors' assets were taken

17  to market together; and all proposals were solicited for some

18  or all, a piece, a part.  You tell us, essentially was the

19  marketing effort; they're all available for sale.  That process

20  prepetition resulted in fourteen

21  non-disclosure agreements that were executed and activity in

22  the data room.

23         Mr. Campbell's testimony would be that, prior to the

24  petition date, bids were solicited for all the debtors' assets,

25  Riverbend and South Altamont, and the debtors, in fact,

1   received bids for both, resulted in a stalking horse with

2   Wapiti Newco in August of this year that was executed

3   prepetition, approved by the board as reflected in Exhibit 3,

4   Your Honor, in conjunction with the board's approval of the DIP

5   financing term sheet with Garrison and approval of the filing

6   of the debtors' Chapter 11 cases.  It was done sort of in a

7   series of board resolutions on the same day in early August.

8          So the board was aware of the Wapiti Newco

9   transaction, approved it, was aware that Wapiti II was out

10  there as a related party, although a separate entity with

11  separate claims.

12         There were also bids received for South Altamont.

13  Unfortunately, no stalking horse agreement was finalized with

14  any parties for those assets.

15         The evidence would be, Your Honor, that after the

16  petition was filed on August the 11th that Parkman Whaling was

17  promptly engaged by the debtors through an application to

18  employ, and the marketing efforts continued post-petition in

19  earnest.  The 70 folks that were contacted initially were

20  contacted again with a teaser, and more than 30 other folks

21  were added to the list post-petition for a total of 104 parties

22  and companies contacted in these cases prepetition and post-

23  petition.

24         The evidence will be, Your Honor, consistent with

25  Exhibit 4, which is Parkman Whaling's contact list, the extent

1    of those contacts with 104 folks.  Over 800 e-mails and calls

2    were made during this process since March.  A total of 36

3    parties signed non-disclosure agreements and got access to the

4    data room.  There were seven field visits, folks interested in

5    talking to the debtors further and kicking the tires in

6    earnest.

7            The evidence will be, Your Honor, consistent with the

8    bid procedures approved by this Court, that the debtors

9    proceeded with a deadline of October 9th for further bids,

10   anybody else, last call for Riverbend, resulted in a competing

11   bid from Monarch Natural Gas.  On a cash basis the evidence

12   will be that the Monarch bid at 5.3 was neutral, given the

13   $200,000 break-up fee and $100,000 expense reimbursement.

14           Monarch's bid also included a commitment to waive a

15   prepetition claim of about $1.1 million, which the debtors

16   viewed as an unsecured claim.  It's hard to discount what the

17   actual cash value of that might be, but it is certainly a

18   consideration in the Monarch bid.

19           With those two bids in hand, the debtors went into

20   the auction on October the 12th.  Monarch and Wapiti Newco

21   appeared.  Counsel for Wapiti II was also there.  At the

22   commencement of the auction the evidence will be that the

23   debtors negotiated further commitments from the stalking horse

24   bidder as a bid enhancement.

25           And in assessing the overall bid value, the

1    commitments to take, where the prior stalking horse had been

2    free and clear of certain claims of both Wapiti II and Monarch,

3    the commitments that were negotiated at the auction flipped

4    that to be essentially a subject-to transaction.  And, again,

5    the face amount of the Wapiti II claims in the litigation and

6    the adversary proceeding are 2.5 million.  Is that really the

7    dollar amount?  No.  The debtors believe that it's far less

8    than what's owed.  Also included in that 2.5 million is the 1.1

9    that Monarch had agreed to waive.

10           So the way the debtors' valuation analysis proceeds

11   is, you're getting rid of two pieces of litigation that aren't

12   going to burn this estate with administrative expenses or

13   distractions or delays.  And delays are only going to hurt

14   these assets.  The longer they sit on the market, the evidence

15   would be, you're not only going to lose time and value because

16   it's a depleting asset, but you're also going to get, you know,

17   deal fatigue, I think is how Mr. Campbell would put it if he

18   were to testify.  And bidders, these 104 folks that have been

19   contacted, are not even going to pay attention to you anymore,

20   because that deal's been around so long.  They have a shelf

21   life in the industry.  So--

22           THE COURT:  You said--let me go back a minute,

23   because you said that the 2.5 includes the 1.1?  I'm not

24   understanding.

25           MR. HARTL:  So the way the contracts were set up, is

1    my understanding, the debtors owe certain amounts to Monarch

2    based on committing of a volume of natural gas to the pipeline.

3    There is an accrued amount for volume deficiencies that are

4    owed that is about $1.1 million, which is what Monarch was

5    willing to waive.

6            Wapiti II claims, as part of their adversary

7    proceeding, that under the joint operating agreement and

8    contracting operating agreement between the debtor and Wapiti

9    II, which, as Mr. Ayer has indicated, is a 50 percent working

10   interest out here in the same field, that those same

11   obligations that the debtor doesn't pay to Monarch, the debtor

12   has to make good on those to Wapiti II, because Wapiti II has

13   its own obligations as being a 50 percent working interest

14   owner out there to Monarch, separate and apart from the

15   debtors.  But they're tied together.

16           THE COURT:  Okay.

17           MR. HARTL:  So the debtors viewed the resolution and

18   the taking of these assets subject-to as taking care of both

19   pieces of litigation, which is a benefit to the estate.  And

20   whatever those claims might be from Monarch and Wapiti II are

21   now the buyer's problem.  There is going to be no fight about

22   sale proceeds with Wapiti II.  They'll look to the buyer.

23           And the evidence will be, Your Honor, that there is

24   already litigation in Texas State Court prepetition between the

25   bidders and Wapiti II on those issues, and it may be the proper

1    place to go resolve them as between the buyer and Wapiti II.

2          There is also litigation between Monarch and Wapiti

3    II pending in Arapahoe County in Colorado.  That might be the

4    proper place to resolve some of those issues post-closing.

5          But the point for the debtors' assessment with

6    Garrison's input was that, you know, getting these sales done

7    and sort of cleaning these midstream contract and operator lien

8    questions away from the estate and letting those be a burden of

9    someone else was a benefit to these estates.

10          Unfortunately, Monarch was given an opportunity to

11    essentially match that and take subject-to the Wapiti II

12    litigation claims and reserving their rights on their own

13    litigation claims.  They declined, perhaps understandably,

14    because assessing what the real liability might be on the back

15    end is difficult.

16          But the fact that they weren't willing to at least

17    match so we could compare apples to apples at the auction led

18    the debtors to choose what I'll call the revised stalking horse

19    PSA as the highest and best offer under the circumstances.

20          Exhibit 4 in your book--I don't know if I've

21    highlighted that for Your Honor, but that's--Mr. Campbell had

22    testified that that's a fulsome contact list and a history of

23    Parkman Whaling's marketing efforts in this case.  He's also

24    testified that that's consistent with both oil and gas industry

25    standards and is a full and fulsome marketing process that

1   could be had in these cases, given the assets and the

2   difficulties with these assets.

3       I think both Mr. Langdon and Mr. Campbell would

4   testify, Your Honor, that however challenging the sale and

5   ongoing litigation has been with Wapiti Newco and Wapiti II,

6   that these negotiations have been at arm's length, that the

7   debtors are not aware of any collusion or any improper motive

8   behind the sale, that as difficult and challenging as the

9   historical disputes with Monarch have been, that the resolution

10   with Monarch to preserve their rights has likewise been in good

11   faith and that their bid was received in good faith, and the

12   negotiations were aboveboard, and there weren't any process

13   taints along the way, if you will.

14       Although we would have liked to have gotten into a

15   bidding war between the two entities from a cash standpoint,

16   it's the non-cash items that really drove the transaction; and

17   that's what the evidence would be.  And although that doesn't

18   return money to unsecured creditors or even to Garrison, the

19   reality is that at $35 million of senior secured debt, you

20   know, three or four million dollars of mechanic's liens and

21   operator's liens on top of that, the value of these assets just

22   isn't there.  And that's driven by production market prices

23   more than anything.

24       Evidence would be, Your Honor, that if we were to

25   call Mr. Bart Agee to the stand, he would testify that although

1    Wapiti Newco and Wapiti II do share some relationship, they are

2    different entities, that there is no improper business motive.

3    In fact, there is a business reason for them to acquire these

4    assets given the 50 percent working interest ownership out

5    there in the field.

6           Mr. Agee, Your Honor, would testify that Wapiti Newco

7    has the ability to fund this, close the transaction, and

8    perform as agreed under the revised form of sale order both

9    with respect to funding the cash transaction and the additional

10   commitments with respect to Wapiti II and Monarch post-closing.

11          The evidence would be, Your Honor, that the timing,

12   although fast in Chapter II context, is not just driven by the

13   secured creditor in this case, but the October 31st drop-dead

14   date was a negotiated term with the buyer prepetition, and that

15   dragging this process out won't increase the value or result in

16   any other bidders than what we have had today.

17          I think consistent, Your Honor, with the case law--

18   and I'm happy to move from proffered evidence into somehow that

19   fits in the standards unless the Court has any questions about

20   what the testimony might be.

21          THE COURT:  I don't think so.  Let me ask Ms. Kennedy

22   if she has any questions about the testimony.

23          MS. KENNEDY:  I don't have any other questions.

24          SPEAKER:  Your Honor, if I may make a correction?  I

25   believe Monarch's bid was 5.4 million, not 5.3.

1          MR. HARTL:  That may be right, but--

2          SPEAKER:  So it was neutral mutual going in.  We had

3    $100,000 (inaudible) plus the $100,000 for the costs, so it's

4    5.4.  So it was not neutral going in.

5          MR. HARTL:  That's fine.  I don't think that changes

6    the--

7          SPEAKER:  I understand.  I just want to make--

8          THE COURT:  All right.

9          SPEAKER:  --make sure that that's clear.

10         MR. HARTL:  And I think the bid documents are on

11   file, Your Honor.  We filed those with the report of option,

12   because Monarch is the backup bidder.

13         THE COURT:  I believe they are.  I must admit I did

14   not go through them in excruciating detail.  I apologize.

15         MR. HARTL:  Nor would I wish that upon anyone.

16         THE COURT:  Ms. Kennedy?

17         MS. KENNEDY:  I don't object to that adjustment, no.

18         THE COURT:  Okay.  Anything further you--are you all

19   right with what's been proffered?

20         MS. KENNEDY:  Oh, yes, Your Honor, that's

21   satisfactory for us.

22         THE COURT:  All right.

23         MR. HARTL:  Your Honor, as a practical matter, even

24   with that extra $100,000, by the time we got into litigation

25   and discovery with Wapiti II on their lien claims, we would

1    have eaten that up and more.  So, you know, I don't think that

2    changes the debtor's bid assessment at all.  And, in fact, the

3    debtor considered that at the auction.

4             THE COURT:  Okay.

5             MR. HARTL:  As far as the standards under 363(b), as

6    I've mentioned at the outside, it's really--under the Caster

7    (phonetic) case from Judge Tallman, which goes back and adopts

8    the Lionel (phonetic) cases in this district, it's really a

9    business judgment standard.

10            And the debtor's business judgment is entitled to

11   substantial deference in these circumstances even if there is a

12   potential hope and a prayer that there might be a better deal

13   out there when the debtor in possession brings a deal to the

14   Court for approval.  The Court's role isn't to second-guess the

15   debtor's business judgment as long as certain standards are

16   satisfied:  improper or bad motive to the sale, the price is

17   fair and negotiations at arm's length, and whether there have

18   been adequate procedures and noticed the parties in interest.

19            I speak to notice a little bit here, Your Honor.  The

20   docket in this case reflects that the original sale motion for

21   the Badlands Production stalking horse purchase was filed at

22   Docket Number 18, along with a separate notice to creditor at

23   Docket Number 19.  We drew some of the preliminary objections

24   at that time, and then we slowed the process down.  And we

25   re-noticed the final sale to more than a thousand parties,

1  including folks that are not creditors in the docket but are

2  potential bidders that are on file with Parkman Whaling.

3         THE COURT:  Is that the same--let's see, I think it

4  was 104 people that they reached out to or companies they

5  reached out to?

6         MR. HARTL:  I believe at that time there had been--

7  you'll see in Exhibit 4 a bunch of almost 90-some people who

8  had passed and decided not to be interested any longer.  So I

9  believe Parkman Whaling's contact list for our mailing purposes

10  was smaller than the full 104, but it was still as broad as it

11  could be to give folks one last chance.  And those notices are

12  on file at Docket Number 166 and 167, both with respect to the

13  final sale approval and the notice of cure amounts.

14         So the docket reflects that we've mailed notices to

15  more than a thousand people probably on more than one occasion.

16  And the debtors would submit that not only have the assets been

17  exposed to the market, but to all creditors and parties in

18  interest for purposes of making competing bids.

19         And at one point the debtors honestly thought, Your

20  Honor, that Dorrier and their group might come to the table and

21  want to buy these assets, but they opted not to participate,

22  which is fine.

23         Under the case law, Your Honor, once those sort of

24  baseline business judgment and process factors are satisfied,

25  the debtors are entitled to some deference on their business

 1   judgment and whether the sale should be approved.  And making

 2   those close valuation, non-cash assessments are really the

 3   proper place for the business judgment rule in this context.

 4           So we think that the debtors have satisfied those

 5   case law requirements for 363(b) and that 363(f) is satisfied

 6   to be sure the liens of Garrison are underwater, but I

 7   believe--and Mr. McIlwain can speak for himself--but I think we

 8   have Garrison's consent for purposes of 363(f).

 9           THE COURT:  If we don't at this point--

10           MR. HARTL:  We've just wasted a morning.

11           THE COURT:  Yes, plus a couple months.

12           MR. HARTL:  As to the other liens, I think they both

13   consent to the terms of the order as stated on the record by

14   Halliburton, Wapiti II, and Monarch.  And the sale proceeds at

15   least remaining are sufficient to cover the face amount of

16   those other lien clients, which is probably what I meant to say

17   at the outside after being--before being corrected by Mr.

18   McIlwain.

19           So under all the facts and circumstances, 363(f) is

20   satisfied for the free and clear sale on the terms of the

21   negotiated form of order.  And we would ask that, unless the

22   Court has any other questions, you consider that proffer and

23   the revised form of order and enter it so we can get to

24   closing.

25           THE COURT:  Thank you, Mr. Hartl.

1          MR. HARTL:  Thank you.

2          THE COURT:  Ms. Kennedy?

3          MS. KENNEDY:  Thank you, Your Honor.  Having heard

4    the proffer of the debtors' testimony, Dorrier is not intending

5    or request to call any of the witnesses to cross on the

6    information that's been put into the record by Mr. Hartl

7    through his proffer.

8          We do stand on our objection, but I think that if we

9    have an opportunity to--I'm looking through the proposed sale

10   order now to make sure that there is appropriate reservation of

11   rights as to the proceeds of the sale if the sale is approved.

12   That would be sufficient to satisfy our needs.  As I had

13   pointed out previously, our larger concerns are that the

14   context--the larger context of the case as opposed to this

15   particular sale.

16         And I do appreciate Your Honor's listening for that

17   reason, because we do think that showing up at the end with a

18   lot of questions would probably be detrimental to our position

19   if not for our being vocal along the way to make sure that our

20   hand is up.

21         THE COURT:  I appreciate that.  It sounds like you

22   need to review the proposed sale order to make sure it

23   addresses your concerns?

24         MS. KENNEDY:  I would like an opportunity to do that.

25   I don't think that I'm going to have any changes, but I just--

```
 1   in light of what we had talked about earlier today on our break
 2   and today, I just wanted to take one more look at the proposed
 3   order.
 4           THE COURT:  Why don't we--I want to look it over.  At
 5   this point I am going to approve the sale.  I think that you've
 6   met your burden.  But I understand that there are issues with
 7   the sale order or there may be, and I'd like you, Ms. Kennedy,
 8   to have time to look through the sale order, make sure it
 9   addresses your concerns.
10           Do you think you could get your comments--I don't
11   know if we can enter the order today.  It'll probably--if we
12   can get it by four o'clock in a form that works for everybody,
13   that's fine.  Otherwise, it will probably enter tomorrow.  But
14   I do want to give Ms. Kennedy an opportunity to review it and
15   make sure that it has the appropriate reservations that she
16   needs in it.
17           So if it's possible, if you could get your comments
18   to Mr. Hartl by, say, three o'clock this afternoon.  If there
19   are any changes, get that over to me by four.  I will be
20   looking at what I have, but--and then if you can point out what
21   additions there are to the order, I'll look at them; and if we
22   can, we'll get it entered today.  It may be first thing
23   tomorrow morning.
24           MS. KENNEDY:  That shouldn't be a problem, Your
25   Honor.  As you stated, I just want to make sure that the order
```

1   has a reservation of right that they can take what actions are

2   necessary in the future as it relates to this sale or--

3           THE COURT:  Sure.

4           MS. KENNEDY:  --you know, other actions in the case.

5   I just don't want to be foreclosed from any opportunity going

6   forward.

7           THE COURT:  No, I understand.

8           MS. KENNEDY:  Thank you.

9           MR. HARTL:  That's fine with the debtors.  And for

10  the record and as we're revisiting the form of order, it's

11  Exhibit 5 in the debtors' exhibits.

12          THE COURT:  Yes, I see it.

13          MR. HARTL:  And particularly, I think paragraph 36 is

14  going to be the sale proceeds reservation issue that is

15  sensitive to Dorrier.  So--

16          THE COURT:  All right.

17          MR. HARTL:  --that's at least where--

18          MS. KENNEDY:  Exactly.

19          THE COURT:  All right.  Well, I will go ahead and

20  look at what I've got while you all--making any tweaks.

21          I guess what I would ask, if you could send over a

22  new redline if there are any changes.

23          MR. HARTL:  Okay.

24          THE COURT:  I don't know that I have--do I have an

25  unredlined iteration?

1          MR. HARTL:  We have not yet filed--given the speed

2     with which this sort of came together in the last--

3          THE COURT:  Yes, it has been fast, hasn't it?

4          MR. HARTL:  --moments before the hearing, we have not

5     filed the notice to reflect these redline changes that's on the

6     record.  I can do that.  And maybe it's best to wait until we

7     have final changes to submit the final redline--

8          THE COURT:  All right.

9          MR. HARTL:  --unless the Court wants this one on the

10    docket first and a clean copy.  Happy to do it either way.

11         THE COURT:  I'm trying to think what would be most

12    efficient, because I am planning to look at what I have as

13    Exhibit 5 as at least almost final.

14         MR. HARTL:  Why don't I go ahead and file that one

15    this afternoon; and then if there are any changes, we'll do a

16    supplement to it and reflect just the changes against this one.

17         THE COURT:  All right.  If you would let us know if

18    there are any additional changes so I won't look to--

19         MR. HARTL:  Sign the wrong order?

20         THE COURT:  --sign anything--sign the wrong order.

21    And I don't want to do that.

22         MR. HARTL:  Okay, we'll get to work.

23         THE COURT:  And I know everybody has been working

24    very hard, and I appreciate everybody's efforts.  I know this

25    is not how--this is not the most ideal of circumstances, but

50

1   that is sort of the way Chapter 11s unfortunately work is it's

2   never the ideal circumstances.

3         Is there anything further that anybody else needs?

4         MR. HARTL:  Nothing from the debtors, Your Honor.

5   Thank you.

6         THE COURT:  Anyone else?  All right.

7         Seeing nothing further, the Court will stand in

8   recess.  Thank you all very much.

9     (Proceedings concluded at 11:39 a.m.)

10

11

12

13

14

15                TRANSCRIBER'S CERTIFICATE

16       "I, court approved transcriber, certify that the

17   foregoing is a correct transcript from the official electronic

18   sound recording of the proceedings in the above-entitled

19   matter."

20

21              Dated this 28th day of October, 2017.

22              /S/ SYLVIA BESEL

23            _____

24              SYLVIA BESEL

25              FEDERAL REPORTING SERVICE, INC.

51

<u>I N D E X</u>

OCTOBER 25, 2017

<u>E X H I B I T S</u>

| <u>NUMBER</u> | <u>OFFERED</u> | <u>RECEIVED</u> |
|---|---|---|
| <u>Debtors'</u> | | |
| 1 through 5 | 29 | 29 |
| <u>Wapiti Utah's</u> | | |
| 1 through 32 | 30 | 30 |