## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 17-17465-KHT |
| | ) | |
| BADLANDS ENERGY, INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Jointly Administered Under |
| | ) | **Case No. 17-17465-KHT** |
| | ) | |

| | | |
|---|---|---|
| MONARCH NATURAL GAS, LLC, n/k/a | ) | |
| MONARCH MIDSTREAM, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Adversary No. 17-01429 KHT |
| v. | ) | |
| | ) | |
| BADLANDS PRODUCTION COMPANY, f/k/a | ) | |
| GASCO PRODUCTION COMPANY, | ) | |
| BADLANDS ENERGY INC., f/k/a GASCO | ) | |
| ENERGY, INC., and WAPITI UTAH, LLC f/k/a | ) | |
| WAPITI NEWCO, LLC, | ) | |
| | ) | |
| Defendants | ) | |

### MONARCH NATURAL GAS, LLC'S MOTION FOR
### SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM

Plaintiff Monarch Natural Gas, LLC ("Monarch"), through undersigned counsel, submits the following memorandum in support of Motion for Summary Judgment pursuant to Fed. R. Bankr. P. 7056, L.B.R. 7056-1 and Fed. R. Civ. P. 56. In support of this Motion, Monarch adopts and incorporates herein the arguments, points and authorities advanced in its Opposition to the Motion for Judgment on the Pleadings filed by Wapiti Utah, L.L.C. ("Wapiti Utah").

### <u>INTRODUCTION</u>

This proceeding addresses the enforcement of mineral dedication covenants commonly incorporated into long-term contracts between upstream oil and gas producers and midstream

companies that gather and transport extracted hydrocarbons to downstream markets. These covenants have been used in the industry for decades – and extensively relied upon – to achieve two primary objectives. First, the producers' dedication of their mineral reserves to the midstream companies' gathering facilities not only secures a stream of revenue but also allows the midstream company to recoup the significant investment incurred in either acquiring and/or constructing its facilities (which are often tailored specifically to the producers' well operations). The dedication covenants, likewise, benefit the producers insofar as they can avoid bearing the infrastructure costs themselves to gather and transport hydrocarbons to processing facilities and to downstream markets in addition to the costs of drilling and production at their wells. Similar dedications are used in connection with the transportation, processing and disposal of salt water and other oil and gas by-products generated at a well site.

These dedications, as commonly recognized expressly by the parties in their contracts, are understood to constitute real covenants running with the land, which operate to bind successors-in-interest even in the event of bankruptcy. Equally important, governing law in Utah and throughout the jurisdictions supports the parties' contractual intent that these dedications constitute covenants running with the land that bind successors and survive bankruptcy.

This proceeding, more specifically, arises out of the attempt by Wapiti Utah to acquire assets owned by the debtor, Badlands Production Company ("Badlands"), including certain oil and gas lease interests, "free and clear" of obligations imposed under two existing contracts with Monarch: a Gas Gathering and Processing Agreement (as amended) and an Agreement for Disposal of Salt Water. Under the Gas Gathering and Processing Agreement, as is custom in the industry, the predecessor-in-interest of Wapiti Utah and Badlands, Gasco Production Company

("Gasco Production"), dedicated its oil and gas reserves and its interests in all "other lands within an Area of Mutual Interest" to a gathering system recently purchased by Monarch from Gasco Production's parent corporation, Gasco Energy, Inc. ("Gasco Energy"). The Agreement for Disposal of Salt Water contained a similar dedication by which Gasco Production committed salt water produced from its oil and gas wells to a disposal system recently purchased by Monarch from Gasco Energy. Both contracts expressly provide that the dedications of mineral reserves and salt water "run with the land."

The reserve and salt water dedications in both agreements meet all requirements for a covenant to run with the land in law and equity. As required under Utah law, the covenants "touch and concern" the land, the parties' expressly intended the covenants to run, and privity of estate exists. Wapiti Utah, therefore, cannot purchase Badlands' assets "free and clear" of the gas gathering and salt water disposal agreements under Section 363 of the Bankruptcy Code or otherwise. No genuine issues of material fact preclude summary judgment in Monarch's favor on these points.

## UNDISPUTED FACTS

### I.      The Asset Purchase Agreement

1.      The debtor Badlands is the successor-in-interest to Gasco Production. Both Badlands and Gasco Production were upstream oil and gas companies[1] engaged in the

---

[1] The oil and gas industry is made up of three distinct sectors: upstream, midstream, and downstream. The upstream sector is focused on finding and developing oil and gas reserves through the exploration for, and the production of, oil and gas, which includes finding undeveloped reserves and drilling wells to bring oil and gas to the surface. Dec. of L. Adair, ¶13 (Exhibit 1).

exploration, development and production of natural gas and natural gas liquids, with operations focused in Uintah and Duchesne Counties, Utah.[2]

2.      Monarch is a company focused on building, acquiring and operating assets in the midstream sector of the oil and gas industry.[3]  Monarch specializes in the gathering, processing and transportation of natural gas from the wellhead to downstream markets.

3.      As of January 2010, Gasco Production operated and owned working interests in approximately one hundred fourteen (114) oil and gas wells and approximately four hundred twenty one (421) associated oil and gas leases affecting various lands located in Uintah and Duchesne Counties, Utah.[4]

4.      At this same time, Gasco Energy, Inc. and Riverbend Gas Gathering, LLC (collectively referred to as "Gasco Energy") owned an approximate 108-mile system in the vicinity of Gasco Production's wells and leases in Uintah and Duchesne Counties that was designed to gather, process and transport produced natural gas to a downstream processing plant. Gasco Production and Riverbend Gas Gathering, LLC were both wholly owned subsidiaries of Gasco Energy.[5]

---

[2] Dec. of J. Williams, at ¶4 (Exhibit 2).

[3] The role of the midstream sector is to provide the necessary assets, facilities, pipelines, and services to move raw hydrocarbons from the producing field and deliver crude oil, natural gas, and/or natural gas liquids to meet the specifications of end users and consumers in downstream markets.  In general, the range of available midstream services includes the following: (i) gas gathering and compression; (ii) water gathering and disposal; (iii) gas treating; (iv) gas processing; (v) natural gas transmission; (vi) NGL gathering, storage and transmission; (vii) crude oil transmission.  Midstream providers, such as Monarch, supply the pipeline facilities necessary to transport the oil, gas and water away from the producing area.  Dec. of L. Adair, ¶15, 19 (Exhibit 1).

[4] Dec. of J. Williams, at ¶5 (Exhibit 2).

[5] *Id.* at ¶6.

5.     Gasco Energy also owned a system in the vicinity of Gasco Production's oil and gas wells that functioned as a disposal site for produced salt water.[6]

6.     A transaction was finalized in January 2010 by which Monarch purchased Gasco Energy's gas gathering and salt water disposal systems for a total consideration of $23 million.[7] On or about January 23, 2010, Monarch and Gasco Energy executed an Asset Purchase Agreement which governed the sale of the gas gathering and salt water disposal systems.[8]

7.     In consideration of and to incentivize Monarch's purchase of Gasco Energy's gathering and disposal systems, the Asset Purchase Agreement obligated Monarch and Gasco Production to execute a Gas Gathering and Processing Agreement and an Agreement for Disposal of Salt Water.  Forms of both agreements were referenced in, incorporated into, and attached to the Asset Purchase Agreement as Exhibit "A" and Exhibit "C."[9]

## II.     The Gas Gathering and Processing Agreement and the Agreement for Disposal of Salt Water

8.     The form Gas Gathering and Processing Agreement, as referenced and incorporated in the Asset Purchase Agreement, was executed by Monarch and Gasco Production on March 1, 2010.[10]

9.     The Gas Gathering and Processing Agreement was amended and restated by the Amended and Restated Gas Gathering and Processing Agreement, effective March 22, 2012.[11]

---

[6] Dec. of J. Williams, at ¶7 (Exhibit 2).

[7] *Id*. at ¶8.

[8] *Id*. at ¶8 and Exhibit 2-A.

[9] *Id*. at ¶9.

[10] *Id*. at ¶10 and Exhibit 2-B.

[11] *Id*. at ¶11 and Exhibit 2-C.

Thereafter, the Amended and Restated Gas Gathering and Processing Agreement was amended on two occasions as Amendment Nos. 1 and 2.[12] The Amended and Restated Agreement, together with Amendment Nos. 1 and 2, are hereinafter referred to collectively as the "GPA."

10.    The GPA obligated Monarch, among other things, to gather, compress and process for a recurring fee all natural gas produced from Gasco Production's oil and gas reserves, leases and all "other lands" located within a contractually-defined Area of Mutual Interest ("AMI"), which area was comprised of over 100,000 acres.[13]

11.    Production from Gasco Production's upstream reserves and other lands within the AMI was (and remains today) the primary supply of natural gas and salt water to Monarch's downstream systems and, thus, was (and remains) the primary source of revenue to recoup Monarch's investment in purchasing the systems from Gasco Energy.[14]

12.    Production from the reserves and other lands within the AMI was (and remains) subject to several market and operational risks, which directly impact the supply of gas and salt water to Monarch's systems.[15] Fluctuations of market prices and risks associated with drilling, for example, have a significant influence on upstream production from the reserves and ultimately the supply of gas and salt water downstream to Monarch's facilities.[16]

---

[12] Dec. of J. Williams, at ¶12 (Exhibit 2) and Exhibits 2-D and 2-E.

[13] Amended and Restated Gas Gathering and Processing Agreement, at Arts. 3-4, pp. 7-10 (Exhibit 2-C); Dec. of J. Williams, at ¶13 (Exhibit 2).

[14] *Id.* at ¶20 (Exhibit 1).

[15] *Id*. at ¶21.

[16] *Id*. at ¶21 (Exhibit 2).

13.     As a result, the GPA had multiple provisions designed to address these risks associated with Monarch's newly-acquired gas gathering and salt water disposal systems, especially in light of the significant investment made to acquire the assets.

14.     To address these operating risks, and to facilitate Monarch's operation of the gas gathering and salt water disposal systems, Gasco Production agreed to various dedications and commitments in the GPA related to its mineral reserves and production of salt water from the lands within the AMI, as well as the operation of its wells.

### A.     The Natural Gas Dedications and Commitments under the GPA

15.     The GPA obligates Gasco Production to dedicate its mineral reserves located within the AMI for gathering, compression and processing at the system recently purchased by Monarch:[17]

> 3.4     Dedicated Reserves.  … Producer (i) exclusively dedicates and commits to the performance of this Agreement the Dedicated Reserves, (ii) represents that the Dedicated Reserves are not otherwise subject to any other gas gathering agreement or commitment and (iii) agrees not to deliver any Gas produced from the Dedicated Reserves and owned by Producer to any other gas gatherer, processor, or gas gathering system.  Producer possesses the right to deliver the Dedicated Reserves to the Gathering System.[18]

"Dedicated Reserves" are defined in the GPA as:

> [T]he interest of Producer in all Gas **reserves in and under**, and all Gas owned by Producer and produced or delivered from (i) the Leases[19] and (ii) other lands

---

[17] The natural gas subject to the GPA is "wet" gas.  Wet gas must be processed prior to the gas entering a transportation pipeline to extract the natural gas liquids, which are sold separately.  The remaining gas is "dry" gas (referred to as residue gas) and may enter intrastate pipelines for transport to other markets.

[18] Amended and Restated Agreement, at ¶3.4, p. 8 (Exhibit 2-C).

[19] The "Leases" under the GPA are comprised of over 400 oil and gas leases in which Badlands owns interests.  *See* Schedule 3 to Amended and Restated Agreement, attached as Exhibit 2-C.

within the AMI,[20] whether now owned or hereafter acquired, along with the processing rights, subject to certain volume exclusions as described herein, and **any and all additional right, title, interest, or claim of every kind and character of Producer or its Affiliates** in (x) the Leases or (y) <u>lands within the AMI</u>, and Gas production therefrom, and all interests in any wells, whether now existing or drilled hereafter, on, or completed on, lands covered by a Lease or within the AMI.[21]

16.     The term "reserves" is commonly referred to as the estimated volumes of oil, condensate, natural gas, natural gas liquids and associated components that are anticipated to be commercially recoverable from known accumulations of <u>unproduced</u> hydrocarbons.[22]

17.     "Reserves," as commonly understood in the industry, has also been referred to as "[t]he <u>unproduced</u> <u>but</u> <u>recoverable</u> oil and/or gas in place in a formation which has been proven by production."[23]

18.     In exchange for Monarch's gas gathering services, Gasco agreed to pay a monthly fee along with other revenues and associated costs and expenses.[24]

19.     The GPA originally obligated Producers to "commit[] $50,000,000.00 (gross) for drilling and completing new wells in the AMI."[25]  Production from these wells within the AMI would be subject to the GPA as "Dedicated Reserves."[26]

---

[20] "AMI," or Area of Mutual Interest, is the geographical location reflected in Schedule 1 to the <u>Amended and Restated Agreement</u>, Exhibit 2-C.

[21] *Id.* at ¶1.1, p. 2 (emphasis added).

[22] <u>Dec. of L. Adair</u>, at ¶13 (Exhibit 1).

[23] Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law, Manual of Oil & Gas Terms, Vol. 8, p. 894 (LexisNexis Matthew Bender 2015) (emphasis added).

[24] <u>Dec. of J. Williams</u>, ¶4.1, p. 9 (Exhibit 2).

[25] *Id.* at ¶3.3(b), p. 8 (Exhibit 2).

[26] *Id.*

20.     The GPA also contained several provisions designed to facilitate Monarch's operation of the newly acquired gathering system.

21.     The GPA, in conjunction with Gasco Production's dedication of its reserves and Monarch's gathering services, granted Monarch a right of way and easement affecting Gasco Production's mineral lease interests "for the purposes of installing, using, inspecting, repairing, operating, replacing, and removing [Monarch's] facilities (including installation of new custody transfer meters and other equipment) used or useful in the performance of this Agreement."[27]

22.     The GPA, in conjunction with Gasco Production's dedication of its reserves and Monarch's gathering services, also granted Monarch an irrevocable right and option to purchase "fifty (50) acres of land contiguous to certain property owned by [Badlands]."[28]  Notably, Gasco Production granted this purchase option to Monarch "[i]n consideration of the mutual covenants and restrictions granted in the [GPA] and consummation of the transactions contemplated by the Asset Purchase Agreement."[29]

23.     Significantly, the GPA expressly provides that the covenants in the agreement run with the land and are binding on Gasco Production and its successors and assigns, which includes Badlands and now Wapiti Utah:

> Producer agrees to cause any existing or future Affiliates of Producer holding Dedicated Reserves to be bound by, and to execute and join as a party, this Agreement.  The dedication and commitment made by Producer under this Agreement is a <u>covenant running with the land</u>.[30]

---

[27] *See* Exhibit "A" to <u>Amended and Restated Agreement</u>, at ¶4 (Exhibit 2-C).

[28] *Id*. at Schedule 4 to <u>Amended and Restated Agreement</u> (Exhibit 2-C).

[29] *Id*.

[30] <u>Amended and Restated Agreement</u>, at ¶3.4, p. 8 (Exhibit 2-C) (emphasis added).

### III.    The Dedications and Commitments under the Salt Water Disposal Agreement

24.    The form Agreement for Disposal of Salt Water, as referenced and incorporated in the Asset Purchase Agreement, was executed by Monarch and Gasco Production on February 26, 2010 (the "SWDA").  Under this agreement, Gasco Production committed produced water extracted from its well operations within certain areas of the AMI – known as the Wilkin Ridge and Riverbend Production Areas – to Monarch's newly-acquired salt water disposal facilities.[31]

25.    In exchange for Monarch's disposal and treatment of the produced water from Producers' oil and gas wells, Gasco Production agreed to pay disposal fees detailed in the SWDA.[32]

26.    The SWDA, similar to the GPA, provided that the commitments in the agreement run with the land and bind all successors and assigns:

> Gasco further agrees to cause any assignee of Gasco's now-existing leasehold to be bound by this Agreement.  The commitment made by Gasco hereunder is a covenant running with the land.[33]

### IV.    Industry Practice

27.    Midstream providers, such as Monarch, are subject to various market, upstream drilling, and other producer performance risks.[34]

28.    Dedications, such as those in the GPA and SWDA, are commonly utilized in contracts between upstream producers and midstream providers to offset these risks, and have

---

[31] SWDA, at Art. 2 (Exhibit 2-F).

[32] *Id*. at ¶3.1, p. 3.

[33] *Id*. at ¶2.1(a), p. 2 (emphasis added).

[34] *See, e.g.,* Dec. of J. Williams, at ¶20-22 (Exhibit 2); Dec. of L. Adair, at ¶¶ 19-22 (Exhibit 1).

been utilized for this purpose for decades.[35]  They are commonly understood to run with the land and bind all successors-in-interest.

29.     A central purpose of the mineral reserve and salt water dedications in the GPA and SWDA, as understood by Gasco Production and Monarch at the time of contracting, was to safeguard revenue to Monarch and mitigate the risks of supply borne by Monarch in light of the significant investment it made in purchasing Gasco Energy's gathering and disposal systems.[36]

## V.     Badlands' Assumption of the GPA and SWDA

30.     In 2013, as part of a larger restructuring of the companies, Gasco Energy changed its name to Badlands Energy, Inc. and Gasco Production changed its name to the debtor, Badlands Production Company.[37]

31.     Gasco Production, as the original contracting party, and Badlands and Wapiti Utah, as the successors-in-interest, are sometimes hereinafter collectively referred to as the "Producers."

## VI.    Wapiti Utah's Attempt to Purchase Badlands' Oil and Gas Assets Free and Clear of the Dedications in the GPA and SWDA

32.     On August 11, 2017, Badlands and certain of its affiliates filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[38]

---

[35] Dec. of L. Adair, at ¶22 (Exhibit 1).

[36] Dec. of J. Williams, at ¶22 (Exhibit 2).

[37] *Id*. at ¶23.

[38] *See* Case Nos. 17-17467, KHT 17-17465 KHT, 17-17469 KHT and 17-17471 KHT.

33.    On October 12, 2017, Wapiti Utah, as the successor to Wapiti Newco, L.L.C., became the successful bidder of Badlands' assets and sought to have an Asset Purchase Agreement approved by the Bankruptcy Court.[39]

34.    Monarch filed the captioned adversary proceeding on October 23, 2017, contending that the reserve and salt water dedications in the GPA and SWDA constitute equitable servitudes and covenants running with the land, and that consequently Wapiti Utah cannot purchase Badlands' assets free and clear of these contracts.[40]

35.    This Court approved the Asset Purchase Agreement between Badlands and Wapiti Utah on October 26, 2017.[41]  In its Order, the Court held:

> The sale of the Property is subject to the determination in the Monarch Adversary, subject to the parties' right to appeal, whether Monarch's gas gathering agreement or salt water disposal agreement is a "covenant running with the land" and thus cannot be sold free and clear…[I]f it is determined that the Monarch agreements cannot be rejected or sold free and clear, Buyer [Wapiti Utah] will be responsible for the obligations under the agreements, including any pre-petition obligations that cannot be sold free and clear, or that the Court otherwise determines must be cured by the Buyer.[42]

## VII.    Wapiti Utah's Motion for Judgment on the Pleadings

36.    On January 25, 2018, Wapiti Utah filed the instant Motion for Judgment on the Pleadings.  Wapiti Utah contends in its motion, *inter alia*, that the GPA and SWDA are not equitable servitudes or real covenants running with the land and, as a result, it purchased Badlands' assets free and clear of the GPA and SWDA by operation of 11 U.S.C. §363(f).

---

[39] [R. Doc. No. 18, Action No. 17-17467 KHT].

[40] [R. Doc. No. 1, Action No. 17-01429 KHT].

[41] [R. Doc. No. 223, Action No. 17-17465-KHT].

[42] *Id.* at ¶39.

37.     Wapiti Utah's arguments are flawed as a matter of law on both points.

## LEGAL DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[43]   The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[44]   In this regard, the non-moving party "may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[45]

### II.     Contracts Containing Covenants Running with the Land Cannot Be Rejected or Assumed Free and Clear Under 11 U.S.C. §363 or §365.

A covenant that runs with the land, under Utah law, "binds successive owners of the burdened or benefited land."[46]   Bankruptcy laws, including 11 U.S.C. §363 or §365, do not trump this well-settled principle of property law.

In *In re Lonesome Pine Holdings, LLC*,[47] the United States Bankruptcy Court for the District of Colorado held that a debtor may not sell property free and clear of covenants running with the land under §363(f).   The Court held that covenants running with the land "create equitable interests that do not compel a person to accept a monetary interest; thus, when

---

[43] Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[44] *Id.* at 323.

[45] *Devery Implement Co. v. J.I. Case Co*., 944 F.2d 724, 726 (10th Cir. 1991).

[46]  *Stern v. Metro. Water Dist*., 2012 UT 16, ¶ 21, 40, 274 P.3d 935, 941, 945 (Utah 2012).

[47] No. 10-34560 HRT, 2011 Bankr. LEXIS 5775, *9 (Bankr. D. Colo. Sept. 1, 2011) (restrictive covenants "are not 'interests' that fall within § 363").

restrictive covenants are involved, there is nothing that can force those who benefit from restrictive covenants to 'forego equitable relief in favor of a cash award.'"[48]  This ruling was reiterated by this Court in *In re Banning Lewis Ranch Co., LLC*,[49] and is aligned with holdings from other jurisdictions.[50]

Monarch's interests under the GPA and SWDA are classified as "property rights" under relevant bankruptcy laws and, as such, are not subject to a free and clear sale under §363 (or rejection under §365).[51]  Therefore, because the GPA and SWDA contain covenants running with the land, as discussed below, they are contracts binding on Wapiti Utah as the successor to Badlands' mineral interests.

III.   **The Dedications in the GPA and SWDA Constitute Covenants Running with the Land.**

Covenants run with the land under Utah law if (1) they "touch and concern" the land; (2) they are intended by the covenanting parties to run with the land; and (3) privity of estate

---

[48] *In re Lonesome Pine Holdings, LLC*,  2011 Bankr. LEXIS 5775, at *9-10.

[49] 532 B.R. 335, 345-46 (Bankr. D. Colo. 2015).

[50]*Gouveia v. Tazbir*, 37 F.3d 295, 298-299 (7th Cir. 1994) (because covenants running with land are interests in property, rather than executory contracts which can be rejected, 11 U.S.C. §§ 363 and 365 of the Bankruptcy Code are inapplicable); *Skyline Woods Homeowners Ass'n, Inc. v. Broekemeier*, 758 N.W.2d 376, 392 & n.36 (Neb. 2008) ("The courts addressing whether a [debtor] may sell property of an estate free and clear of restrictive covenants under § 363(f) have all concluded that such a sale is not permitted.") (citing *Gouveia v. Tazbi*r, 37 F.3d 295 (7th Cir. 1994); *In re WBQ Partnership*, 189 B.R. 97 (Bankr. E.D.Va. 1995); *In re Oyster Bay Cove, Ltd*., 161 B.R. 338 (Bankr. E.D.N.Y. 1993); *In re 523 E. Fifth St. Housing Pres. Dev. Fund*, 79 B.R. 568 (Bankr. S.D.N.Y. 1987).

[51] *Gouveia*, 37 F.3d at 298 (in ruling §363 applicable, the court observed "although restrictive covenants (such as the one here at issue) may contain the characteristics of both a contract and an interest in real estate, the primary nature of such covenants is not contractual but rather a property interest."); *see also In re Banning Lewis Ranch Co., LLC*, 532 B.R. at 347.

exists.[52]   Likewise, a covenant constitutes an equitable servitude – i.e., it runs with the land "in equity" – only if the requirements of intent and touch and concern are satisfied, and the covenantor has actual or constructive knowledge of the covenant.[53]   A successor-in-interest, whether the interest is acquired in bankruptcy or otherwise, is bound to a covenant if it is found to run with the land in law or in equity.[54]   Here, the covenants in the GPA and SWDA satisfy all elements to qualify as real covenants running with the land both as a matter of law and equity. The contracts, therefore, cannot be rejected or assumed free and clear in the bankruptcy proceeding under §363 or §365.

 **A. The Covenants in the GPA and SWDA Touch and Concern the Land.**

 The Utah Supreme Court, in *Flying Diamond Oil Corp*., summarized the touch and concern standard as follows:

> The touch-and-concern requirement focuses on the nature of the burdens and benefits that a covenant creates. What is essential is that the burdens and benefits created must relate to the land and the ownership of an interest in it… Thus, to touch and concern the land, a covenant must bear upon the use and enjoyment of the land and be of the kind that the owner of an estate or interest in land may make because of his ownership right.[55]

---

[52] *Flying Diamond Oil Corp. v. Newton Sheep Co*., 776 P.2d 618, 623 (Utah 1989).   Under Colorado law, a covenant runs with the land if the requirements of intent and touch and concern are satisfied.   *Reishus v. Bullmasters*, LLC, 2016 COA 82, ¶38, 2016 Colo. App. LEXIS 697 (Colo. App. 2016).

[53] *Flying Diamond Oil Corp.*, 776 P.2d at 623, fn. 6.

[54] *See id.*

[55] *Id*. at 624.

Indeed, the Supreme Court emphasized that "**all** that must be shown for a covenant to run with the land is that it 'be of such character that its performance or nonperformance will so affect the use, value or enjoyment of the land itself….'"[56]

> **(i)    The Dedications in the GPA and SWDA Touch and Concern the Land Even if Construed <u>Separately</u> from the Remaining Provisions in the Contracts.**

It is axiomatic that the agreements in this case must be read as a whole.  *See* subsections (ii) and (iii) *infra*.  This rule of construction was not addressed at all by Badlands in its Motion for Judgment on the Pleadings.  Instead, Wapiti Utah contends that the dedications in the GPA and SWDA should be parsed and viewed in isolation of the remaining provisions in the contracts to determine if they touch and concern and ultimately run with Badlands' mineral interests.[57] This position flatly contradicts Utah law (and Colorado law).  Nevertheless, even if Wapiti Utah's misapplication of law is accepted, the dedications touch and concern the land when read separately from the remaining provisions in the GPA and SWDA.

The Producers' "Dedicated Reserves" are burdened by the covenants in the GPA. "Dedicated Reserves," in turn, are defined as the Producers' interests:

> in all **<u>Gas reserves in and under</u>**, and all Gas owned by [Badlands] and produced or delivered from (i) the Leases and (ii) other lands within the AMI, … and any and **all additional right, title, interest, or claim of *every* kind and character of [Badlands] or its Affiliates** in (x) the Leases or (y) **<u>lands within the AMI</u>**, and Gas production therefrom, and all interests in any wells, whether now existing or drilled hereafter, on, or completed on, lands covered by a Lease or within the AMI.[58]

---

[56] *Flying Diamond Oil Corp.*, 776 P.2d at 623-624 (emphasis added).

[57] <u>Wapiti Utah's Motion for Judgment on the Pleadings</u>, at p. 10, ¶33. ("only specific terms within a contract can qualify as real covenants").

[58] <u>Amended and Restated Agreement</u>, at ¶1.1, p. 2 (Exhibit 2-C) (emphasis added).

"Reserves" are commonly understood in the industry to be the "<u>unproduced but recoverable</u> oil and/or gas in place in a formation which has been proven by production."[59] Further, Utah law defines "real property" as "any right, title, estate, or interest in land, including all <u>nonextracted minerals located in, on, or under the land</u>…."[60]   Under the GPA, therefore, the "Dedicated Reserves," which include the Producers' interests in the non-extracted minerals comprising its reserves and leases, are "<u>real property</u>."   And, the burden imposed by the GPA on the "use, value or enjoyment" of these otherwise exclusive real property interests establishes that the reserve dedication touches and concerns the land.[61]

*American Refining Co. v. Tidal Western Oil Corp.*, 264 S.W. 335, 338 Tex. Civ. App.—Amarillo 1924) is instructive.   In that case, Tidal sought to enforce a gas sales contract against a producer as a covenant running with the land.   The contract provided that the producer "covenant[ed] and agree[d] to…supply and deliver unto [purchaser]…all of the casinghead gas and gas coming from the oil wells…which may be produced from oil wells now or hereafter to

---

[59] Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law, Manual of Oil & Gas Terms, Vol. 8, at p. 894 (LexisNexis Matthew Bender 2015).  The term has also been defined as "[a] discovered resource.  That portion (in barrels or cubic feet) of an identified oil or gas resource which can be economically extracted or produced using current technology."  *Id.* (quoting U.S. Minerals Management Service, Proposed Final Comprehensive Outer Continental Shelf (OCS) Natural Gas and Oil Resource Management Program 1992 – 1997, Appendix 17 (1992)); *See also* Dec. of L. Adair, ¶13 (Exhibit 1) ("The estimated volumes of oil, condensate, natural gas, natural gas liquids and associated components that are anticipated to be commercially recoverable from known accumulations of <u>unproduced</u> hydrocarbons are commonly referred to as "reserves.") (emphasis added).

[60] Utah Code § 57-1-1(3); *State of Utah v. Babbitt*, 830 F. Supp. 586, 594, fn. 14 (D. Utah 1993) ("[a] traditional oil and gas lease is an actual conveyance of a real property interest."); *Hagood v. Heckers*, 513 P.2d 208 (Colo. 1973) (the lessee of an oil and gas lease owns an interest in real estate); C.R.S. § 24-65.5-101 ("The general assembly recognizes that the surface estate and the mineral estate are separate and distinct interests in real property….").

[61] *Flying Diamond Oil Corp.*, 776 P.2d at 624.

be located or drilled upon the lands above described."[62]   In particular, the contract called for payment "for each thousand cubic feet of casinghead gas received."[63]   The producer argued that the covenant did not run with the land because the contract only vested the purchaser with an interest in personal property in the form of the produced natural gas.[64]   In holding that the covenant met the touch and concern requirement, the court disagreed and "[thought] the covenants contained in the lease [were] real rather than personal covenants, because **at the time the contract was made it had for its object gas which was then inherent in and part of the land itself.**"[65]

Similarly, in *Local Federal Savings & Loan Association of Oklahoma City v. Eckroat*,[66] the Oklahoma Supreme Court held that a covenant to pay oil and gas royalties ran with the land because it "dealt primarily with the oil in place."   The court emphasized that the covenant to pay royalties ran with the land because the oil "had not yet been reduced to possession at the time of the covenant."[67]   Significantly, the rulings in *American Refining* and *Eckroat* are aligned with the vast majority of decisions from the jurisdictions addressing whether an agreement to furnish gas is a covenant running with the land, including the State of Colorado.[68]

---

[62] *Flying Diamond Oil Corp.*, 776 P.2d at 336.

[63] *Id*.

[64] *Id*. at 338.

[65] *Id*.  *See also Prochemco, Inc. v. Clajon Gas Co*., 555 S.W.2d 189, 191 (Tex. App.— El Paso 1977) ("One of the types of contracts that may run with the land is one to furnish gas").

[66] 100 P.2d 261 (Okla. 1940).

[67] *Id*. at 262. *See also Richardson v. Mustang Fuel Corp*., 772 P.2d 1324, 1325 (Okla. 1989) ("promise to supply gas operates as a covenant running with the land").

[68] *See Universal Resources Corporation v. Ledford,* 961 P.2d 593, 595 (Colo. App. 1998) ("In addition to the rent and royalty payments given as consideration for an oil and gas lease, a lessee

Here, too, the reserve dedication in the GPA, together with Monarch's reciprocal obligations to gather, compress and transport the gas, were imposed <u>prior</u> to any production of hydrocarbons from the "Dedicated Reserves."  The objective of the GPA's dedication – pre-production interests in oil and gas reserves, leases and all other lands within the AMI – is "inherent in and a part of the land itself" and otherwise deals with real property interests in "nonextracted minerals located in, on, or under the land."[69]  Consistent with the majority rule, the Producers' dedication of the "Dedicated Reserves" for the purpose of furnishing gas to Monarch's gathering facility constitutes a covenant that touches and concerns the land.  No reason exists for the Court to deviate from the majority on this issue.

As *Flying Diamond* instructs, "**all** that must be shown" for a covenant to run with the land is that it "affect the use, value or enjoyment" of the real property interest at issue.[70]  Producers' interests in the "Dedicated Reserves" implicate numerous recognized rights,

---

sometimes agrees to furnish free gas to the lessor for domestic use. This benefit, commonly termed a 'free gas clause,' is deemed a covenant running with the land unless the benefit is limited to a named individual…the rights arising from a free gas clause are generally characterized as a covenant which runs with the surface estate….") (citing 3A W. Summers, Oil & Gas 587 (2d ed. 1958)); *Slife v. Kundtz Properties, Inc*., 318 N.E.2d 557, 560 (8th Dist.1974) ("Appellee concedes that the covenant to supply gas at reduced rates is a real covenant, and we conclude that it is real as it is clearly a charge  on the land and runs with the land. The language the covenantor used to create its several benefits clearly 'touch and concern' the land in question and strongly infers that the parties intended the covenant to run with the land."); *Alderson v. Empire Natural Gas Co*., 227 P. 347, 349 (Kan. 1924) ("Covenants of a gas and oil lease to pay rent and to furnish the lessor with gas to heat and light his dwellings on the premises are covenants running with the land.") (<u>quoting</u> *Indiana Nat. Gas, etc., Co. v. Hinton*, 159 Ind. 398); *Harbert v. Hope Natural Gas Co*., 84 S.E. 770, 773 (1915) (same); *see also* 4-53 Kuntz, Law of Oil and Gas § 53.6 (covenants to supply gas have been "treated as a covenant that runs with the lease and is binding on subsequent assignees, <u>whether or not they assume the obligations contained in the lease</u>") (emphasis added).

[69] Utah Code § 57-1-1(3); *Chase v. Morgan*, 339 P.2d 1019, 1021 (Utah 1959).

[70] *Id*.

including "the <u>exclusive</u> right to develop the resource,"[71] as well as the right to "market" and "dispose" of the minerals.[72]  By requiring Producers to dedicate their interests in oil and gas reserves, leases and all other lands within the AMI (again, "real property" rights in both Utah and Colorado), and by further mandating that the Producer pay corresponding fees, the dedication covenant in the GPA read alone affects the "use, value or enjoyment" of their interests by limiting the right to possess, develop, and dispose of the minerals.

Moreover, the GPA obligates Gasco Production to cause any successor to its Dedicated Reserves (e.g., Badlands and Wapiti Utah) to be bound to the contract.  As restrictions on the rights of the Producers and any successors to produce, develop and dispose of minerals from the "Dedicated Reserves," these contractual provisions lessen the value of Producers' real property interests because prospective buyers must agree to be bound by the covenants.  The Utah Supreme Court made this point clear in *Flying Diamond*.[73]

The dedication of salt water in the SWDA, likewise, touches and concerns the land. Contrasted to Wapiti Utah's assertion, the majority of courts have held that contracts for the provision of water run with the land.  In *Montfort v. Trek Resources*,[74] the court held that a covenant touched and concerned land when it required the owner of a mineral estate to furnish

---

[71] *Babbitt*, 830 F. Supp. at 594, fn. 14 (emphasis added).

[72] *Slaaten v. Cliff's Drilling Co*., 748 F.2d 1275, 1277 (8th Cir. 1984); *Chevron Oil Co. v. United States*, 471 F. 2d 1373 (Ct. of Claims - 1973) ("[a] mineral lease conveys an interest in land in place that permits the lessee to reduce to possession and to dispose of part of the land involved.").

[73] *Flying Diamond Oil Corp.*, 776 P.2d at 627 (contractual provision that expressly "preclude[ed] the separate assignment of [royalty] payments apart from the surface ownership" reinforced the argument that the payment provision touched and concerned the land).

[74] 198 S.W.3d 344 (Tex. App.—Eastland 2006).

water to the house of the owner of the related surface estate.  The water in *Montfort*, like here, was transferred to the grantee's house after it was extracted from the ground and flowed through the grantor's gathering system.[75]  In fact, the court emphasized that "case law from other jurisdictions establishes that covenants to supply or furnish water generally run with the land."[76] And, like the GPA, the SWDA also contains restrictions on the right of assignment, which operates to lessen the value and enjoyment of the Producers' mineral interests.

In short, the dedications in the GPA and SWDA, even when read separately from the remaining provisions in the contracts, affect "the use, value or enjoyment" of the Producers' mineral interests.  The GPA and SWDA, therefore, "touch and concern" these interests as a matter of law.

> **(ii)  Utah Law Requires That the Covenants in the GPA and SWDA Be Read <u>As a Whole</u> in Light of <u>All</u> Relevant Contractual Provisions To Determine If They Touch and Concern the Land.**

The laws of Utah (and Colorado) are settled that real covenants should be construed in light of all mutual and interdependent contractual provisions when determining if they "touch and concern" the land.  Wapiti Utah's contention to the contrary in its Motion for Judgment on the Pleadings is misplaced.[77]

The Utah Supreme Court, in *Flying Diamond, supra*, addressed the touch and concern element extensively.  In that case, the court held that a mineral owner's promise to pay a 2 1/2% oil and gas royalty to a surface owner in a "Surface Owner's Agreement" constituted a covenant

---

[75] *Montfort*, 198 S.W.3d at 354-356.

[76] *Id*. at 355 (citing *Camenisch v. City of Stanford*, 140 S.W.3d 1, 5 (Ky. Ct. App. 2003) and 20 Am. Jur. 2d Covenants, Conditions, and Restrictions (1995)).

[77] <u>Wapiti Utah's Motion for Judgment on the Pleadings</u>, at p. 10, ¶33. ("only specific terms within a contract can qualify as real covenants").

running with the land. The court noted, at the outset, that the discrete payment obligation at issue must be viewed in light of its "purpose" and other provisions in the Agreement which created various rights "tied" to the land.[78]

The Supreme Court, for example, focused on "easements and surface rights" that were created in conjunction with the royalty payment obligation, noting that "the 2 1/2% covenant to pay…is <u>tied</u> to the broad and unusual surface rights" granted in the agreement."[79] "Each of the various types of surface rights that the Agreement grants…is designed to facilitate oil and gas exploration and production," the court held, "and each type of surface right is accompanied by a reciprocal promise…to pay the surface owner for the use of the surface."[80]

The court in *Flying Diamond* also paid special attention to a non-assignment clause in the Agreement, which it found to "reinforce[] the mutual dependence of the two covenants and their relationship to the ownership of the surface of the land."[81] In light of <u>all</u> of the reciprocal and mutually dependent covenants in the Agreement that were found to be "tied" to the land, the Utah Supreme Court held that the specific royalty payment covenant in the Agreement touched and concerned the land.[82]

Courts in Colorado follow the same approach as Utah and read covenants as a whole in determining whether they touch and concern or otherwise run with the land. In *Reishus v.*

---

[78] *Flying Diamond Oil Corp.*, 776 P.2d at 625-626.

[79] *Id.* at 625 (emphasis added).

[80] *Id.*

[81] *Id*. at 627.

[82] *Id.*

*Bullmasters, LLC*,[83] the court looked to provisions and the underlying purpose of a 2007 Amended Agreement, which addressed various land-use rights of co-owners of property, and concluded that the agreement touched and concerned the land when read as a whole:

> the 2007 Amended Agreement touches and concerns the land **when read as a whole**. Its stated intent is 'to have an agricultural property that would also provide a quality hunting experience.' It includes detailed provisions for the location, structure type, and maintenance of residential dwellings that the co-owners can build on the ranch. And it contains use restrictions involving tree-cutting, motor vehicles, and guest visitation. These provisions are **closely tied with the use, possession, and enjoyment of the ranch**. In light of these provisions, we are convinced that the 2007 Amended Agreement touches and concerns the land and constitutes a real covenant.[84]

The *Reishus* court flatly rejected the argument that individual provisions should be read alone in determining whether an agreement or covenant touches and concerns the land: "we do not read individual provisions in isolation when deciding whether a covenant is real or personal; instead, we look at the covenant as a whole… In our view, the 2007 Amended Agreement as a whole touches and concerns the land and constitutes a real covenant."[85]   Colorado jurisprudence is uniform on this point.  *See Cloud v. Ass'n of Owners, Satellite Apartment Bldg., Inc.,* 857 P.2d 435, 441 (Colo. App. 1992) (concluding that, while challenged provision standing alone did not touch and concern the land, the covenant as a whole did run with the land, and the court would not "cut and paste the covenant").

---

[83] 2016 COA 82, 2016 Colo. App. LEXIS 697 (Colo. App. 2016).

[84] *Id*. at ¶44.

[85] *Id*. at ¶45.

23

      **(iii)**    **The GPA and SWDA "Touch and Concern" the Producers' Mineral When Read as a Whole in Light of All Relevant Contractual Provisions.**

The relation between the dedications in the GPA and SWDA and Producers' mineral interests is even more compelling when viewed in light of the contracts as a whole. Similar to the discrete royalty covenant at issue in *Flying Diamond*, the reciprocal and mutually dependent covenants in the GPA and SWDA reinforce that the dedications affect "the use, value or enjoyment" of the Producers' interests.

At the outset, the dedications in the GPA and SWDA should be viewed in light of the purpose for which they were granted – as consideration and incentive for Monarch's significant investment in purchasing Gasco Energy's 108-mile gathering system and the disposal system. In consummating this real property acquisition, the Asset Purchase Agreement obligated Monarch and Gasco Production to execute the GPA and SWDA and, more specifically, obligated the Producers to commit the "Dedicated Reserves" to Monarch's newly-acquired facilities. The GPA and SWDA dedications, in this regard, benefited Monarch's real property interests in the gathering and disposal systems and burdened the Producers' "Dedicated Reserves."[86]

Specific to the GPA, the parties contracted for additional covenants that are mutually dependent on and are "tied" to the "Dedicated Reserves." Producers were obligated to invest $50,000.00 to drill and complete new wells within the AMI, and production from these wells would be subject to the GPA as "Dedicated Reserves."[87] In conjunction with the dedication of

---

[86] *Flying Diamond Oil Corp.*, 776 P.2d at 624 ("The test for whether a covenant 'touches and concerns the land' is whether it enhances the lands' value [on the benefit side], and for the burden side, whether diminishes the land's value.").

[87] Amended and Restated Agreement, at ¶3.3(b), p. 8 (Exhibit 2-C).

the "Dedicated Reserves," the Producers also granted Monarch a right of way and easement to assist and facilitate Monarch's operation of its 108-mile gathering system.[88]   Lastly, in consideration of the "mutual covenants…granted in the GPA" and in "consummation of the…Asset Purchase Agreement," the GPA conveys to Monarch an irrevocable right and option to purchase fifty (50) acres of land also in furtherance of Monarch's gathering and processing operations.[89]

Significantly, each of these mutually dependent covenants in the GPA – the drilling commitment, the easement, and the purchase option – have been separately held to constitute real covenants running with the land.[90]   It follows that the dedication of the Producers' interests in their mineral reserves, leases and all other lands within the AMI," when viewed in light of all mutually dependent covenants in the GPA, should likewise be construed as running with the land.

In *Flying Diamond*, the Utah Supreme Court held that a discrete "promise to pay money," which it noted "at first blush appear[ed] to be a personal covenant," touched and concerned the land because the various "reciprocal" and "mutually dependent" obligations in the parties'

---

[88] Exhibit "A" to Amended and Restated Agreement, at ¶4 (Exhibit 2-C).

[89] Schedule 4 to Amended and Restated Agreement, at ¶4 (Exhibit 2-C).

[90] *See* 2-4 Williams & Meyers, Oil and Gas Law § 403.3 n.2 (5th ed. 2013 ("The usual covenants, express and implied, in oil and gas leases, e.g., to drill a test well or to offset, obviously touch and concern the estates owned by lessor and lessee."); *Flying Diamond*, 776 P.2d at 625 ("[c]learly, the establishment of an easement may touch and concern the land"); *L&M Corp. v. Loader*, 688 P.2d 448, 449 (Utah 1984) (option to purchase real property "passes to an assignee upon assignment (as a covenant running with the land)."); *In re Bergt*, 241 B.R. 17 (Bankr. D. AK. 1999) (holding a right to first refusal is not executory and section 365(a) could not be used to avoid the contractual right).

Agreement were "tied" to the ownership of the real property at issue.[91]  Here, the Producers committed the "Dedicated Reserves" and produced salt water to the GPA and SWDA as consideration for Monarch's acquisition of the gathering and salt water disposal systems (real property) and Monarch's reciprocal agreement to devote these systems to gathering, processing and/or disposal of Producers' gas and salt water.  The dedications burden the Producers "Dedicated Reserves," including their mineral reserves and interests in all lands within the AMI, to the benefit of Monarch's systems (which are in all events real property).

In conjunction with the dedication in the GPA, the Producers also assumed drilling commitments within the AMI and conveyed an easement and purchase option to Monarch in furtherance of the operation of the gathering system.  All of these reciprocal and mutually dependent obligations imposed on both contracting parties are "tied" to the Producers' ownership of the Dedicated Reserves, affect the use, value and enjoyment of the Dedicated Reserves, and in all events "touch and concern" these real property interests.[92]

### (iv) The Legal Authority on Which Wapiti Utah Relies in its Motion for Judgment on the Pleadings is Factually Distinguishable and Not Legally Controlling.

Wapiti Utah, in its motion for judgment on the pleadings, cites primarily to two decisions in support of the contention that the GPA and SWDA do not touch and concern the land:  *Eagle Enterprises, Inc. v. Gross*, 349 N.E.2d 816 (N.Y 1976) and *In re Sabine Oil & Gas Corp*., 547 B.R. 66, 69 (Bankr. S.D.N.Y. 2016), aff'd 567 B.R. 869 (S.D.N.Y. 2017).  Both decisions, rendered by courts in New York, are distinguishable on the facts and as matter of law.

---

[91] *Flying Diamond*, 776 P.2d at 625, 627.

[92] *Id*. at 626-627.

In *Eagle Enterprises*,[93] the court found that a landowner's obligation to <u>purchase</u> water "for only six months of the year" did not touch and concern the land.[94]  The respondent landowner purchased land under a deed that contained a covenant that obligated him to purchase water from the appellant on a seasonal basis.  In finding that the covenant did not run with the land, the court held "[t]he obligation to receive water from appellant resembles a personal, contractual promise to purchase water rather than <u>a significant interest attaching to respondent's property</u>."[95]  The court noted the lack of evidence that the respondent landowner would be deprived of water but for his "obligation to receive;" in fact, the court emphasized that the respondent had found another source of water.[96]  In addition, the court noted an "additional reason why [it] was reluctant to enforce the provision" – in New York, affirmative covenants are disfavored out of concern they impose "undue restriction on alienation or an onerous burden in perpetuity."[97]

*Eagle Enterprises* is distinguishable on multiple grounds.  First, this case does not involve the obligation to receive or purchase water on a seasonal basis, which the *Eagle Enterprise* court found to resemble a personal contract.  The Producers' mineral reserve and salt water dedications in the GPA and SWDA involve the <u>supply</u> of natural gas and water to Monarch's systems (real property).  The covenant to supply water, like the covenant to supply

---

[93] 349 N.E.2d 816 (N.Y 1976).

[94] *Id*. at 819.

[95] *Id*.

[96] *Id*.

[97] *Id*. at 820.

gas, has been commonly held to touch and concern the land.[98]   Moreover, the dedications in the GPA and SWDA relate to production of gas and water from the Producers' real property interests and were made in consideration of Monarch's significant investment in purchasing the gathering and disposal facilities.   This provides the "significant interest attaching to [the covenantor's] property" that was lacking in *Eagle Enterprise*.[99]   Lastly, the ruling in *Eagle Enterprise* was premised on New York's disfavor of affirmative covenants that restrict the alienation and/or burden property in perpetuity.   Based on this policy, New York law adheres to a heightened clear and convincing standard for demonstrating that covenants run with the land.[100]   The Utah Supreme Court, however, has specifically refused to follow New York's heightened standard of review.[101]

*In re Sabine Oil & Gas Corporation* is also factually and legally distinguishable.   In that case, the United States Bankruptcy Court for the District of New York interpreted Texas law and concluded that two gas gathering agreements did not "touch and concern" the land because "[t]he covenants at issue concern only Sabine's interests in the <u>produced</u> "Products."[102]   "They concern only the Products produced from real property," the court further held, "and affect only Sabine's personal property rights."[103]   Here, however, the dedication in the GPA, made prior to production

---

[98] *See Montfort*, 198 S.W.3d at 355 ("case law from other jurisdictions establishes that covenants to supply or furnish water generally run with the land"); *see also* ft. note 76.

[99] *See also Flying Diamond Oil Corp.*, 776 P.2d at 624 ("The test for whether a covenant 'touches and concerns the land' is whether it enhances the lands' value [on the benefit side], and for the burden side, whether diminishes the land's value.").

[100] *See Stern*, 2012 UT 16, ¶ 21, 40.

[101] *Id.*

[102] *In re Sabine Oil and Gas Corp.*, 547 B.R. at 77.

[103] *Id.* at 78.

of the minerals, concerns the Producers' "Dedicated Reserves," which are recognized as "interests in non-extracted minerals" and are legally defined as "real property" under Utah law.[104]  The Producers' "Dedicated Reserves" simply do not concern "products produced from real property" – the interests themselves are real property under Utah law.  The dedication in the GPA also extends even broader to "all **additional** right, title, interest, or claim of every kind and character of Producer or its Affiliates in the Leases or lands within the AMI…."[105]

The district court's ruling, in *In re Sabine Oil and Gas Corp.*, is also fundamentally at odds with Utah law.  In affirming the bankruptcy court's decision, the district court concluded that neither of the gathering agreements at issue touched and concerned the land primarily because of the absence of any actual conveyance of an interest in real property from Sabine to the midstream companies.[106]  Instead of analyzing whether the covenants affected the "use, value or enjoyment" of the land, the district court analyzed whether the covenants operated as an actual conveyance of Sabine's property or some related property interest.[107]  Nowhere under Utah law (or even Texas law)[108] is such a real property conveyance required for a covenant to run with the land.  A real covenant is not a freehold estate or interest in land, like an oil and gas lease; rather,

---

[104] Utah Code § 57-1-1(3).

[105] Amended and Restated Agreement, ¶1.1, p. 2 (Exhibit 2-C).

[106] *HPIP Gonzales Holdings, LLC v. Sabine Oil & Gas Corp. (In re Sabine Oil & Gas Corp.)*, 567 B.R. 869, 875-876 (S.D.N.Y. 2016).

[107] *Id*.

[108] For example, the covenant in *American Refining, supra*, addressed a casinghead gas sales contract, which certainly cannot be construed even remotely as transferring an ownership interest in the burdened land.  *See also Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982) (an "Area of Mutual Interest" created in favor of plaintiff in an assignment of an oil and gas farmout agreement constituted a covenant running with the land); *Prochemco, Inc. v. Clajon Gas Co.*, 555 S.W.2d 189 (Tex. Civ. App.—El Paso 1977) (gas supply contract in support of agricultural activities created a covenant running with the land).

it is nothing more than "an agreement or promise of two or more parties that something is done, will be done or will not be done."[109] Wapiti Utah, in fact, concedes this point in its Motion for Judgment on the Pleadings.[110] And, again, under Utah law, "**all** that must be shown for a covenant to run with the land is that it 'be of such character that its performance or nonperformance will so affect the use, value or enjoyment of the land itself….'"[111] The question is whether the covenants <u>burden</u> –not convey – a real property interest.

Moreover, the *Sabine* decisions do not involve the various other reciprocal and mutually dependent covenants contained in the GPA or SWDA (or the Asset Purchase Agreement), which read as a whole in conjunction with dedications, unquestionably affect the use, value and enjoyment of the Producers' mineral interests. This is another critical distinction between *Sabine* and this case as well as *Flying Diamond* and Utah law in general.

Lastly, *Sabine* is not even controlling authority. Another jurisdiction's laws are at issue, and the case is currently pending on appeal before the United States Court of Appeals for the Second Circuit.[112] Notably, the decision has also received considerable criticism, including by one bankruptcy judge in Texas (the law at issue in *Sabine*), who remarked that "I've been looking for an opportunity to correct the State of New York."[113]

---

[109] Powell on Real Property, § 60.01 (citing several cases).

[110] <u>Motion for Judgment on the Pleadings</u>, at ¶31, pp.9-10 [R. Doc. No. 22] ("A covenant is a '[a] promise made in a deed or implied by law; esp., an obligation in a deed burdening or favoring a landowner").

[111] *Flying Diamond Oil Corp.*, 776 P.2d at 623-624 (emphasis added).

[112] *See In re: Sabine Oil & Gas Corp.*, No. 17-1026(L) (2nd Cir. 2017).

[113] *See* Transcript of Hearing on June 30, 2016 in *In re: Sandridge Energy, Inc., et al.*, No. 16-32488 (Bankr. S.D. Tex. 2016), attached hereto as Exhibit 3. The parties ultimately settled the real covenant issue before the Court could address it.

**B.      The Parties Intended the Dedications in the GPA and SWDA to Run With the Land.**

The next requirement is that the parties intend for the covenant to run with the land. In this case, there is no question the parties understood and intended that the obligations under the GPA and SWDA would be burdens binding not only Gasco Production at the outset but any successor to its mineral interests, such as Badlands and Wapiti Utah.

"An express statement in the document creating the covenant running with the land is usually dispositive of the intent issue."[114]  Both the GPA and the SWDA expressly provide that the commitments and dedications contained in the contracts constitute "covenant[s] running with the land."[115]  Moreover, the agreements expressly bind the parties' successors and assigns.[116] The language in the GPA and SWDA is dispositive on the element of intent.

Nevertheless, the contractual intent of Monarch and Producers can be further gleaned from the nature and circumstances surrounding the execution of the GPA and SWDA.[117] Monarch made a substantial capital investment of $23 million in purchasing Producers' 108-mile gathering system and salt water disposal system in reliance on the covenants contained in the GPA and SWDA.[118]  Specific to the GPA, the multiple covenants and obligations in the

---

[114] *Flying Diamond Oil Corp.*, 776 P.2d at 627.

[115] *See* Amended and Restated Agreement, at ¶3.4, p. 8 (Exhibit 2-C); SWDA, at ¶2.1(a), p. 2 (Exhibit 2-F).

[116] *See Id.* at ¶11.2, p. 21 (Exhibit 2-C); SWDA, at ¶2.1(a), p. 2 (Exhibit 2-F).

[117] *Flying Diamond Oil Corp.*, 776 P.2d at 627 ("The parties' intent may also be implied by the nature of the covenant itself").

[118] Dec. of J. Williams, at ¶¶20-22 (Exhibit 2).  *See also* Restatement § 2.2 cmt. H ("If an investment by the grantee is contemplated by the parties…the extent to which the value of that investment is related to the [burden upon] the grantor's land is a significant factor in determining the parties' intent.").

agreement, including the reserve dedication, the easement, the drilling commitments, and the option to purchase 50 acres in the AMI in furtherance of Monarch's gathering services, were imposed on Producers in exchange for Monarch's capital investment in purchasing the gathering system.

The underlying purpose of executing the GPA and SWDA—both of which were incorporated by reference in the Asset Purchase Agreement governing the purchase of the gathering and disposal systems—was to offset various market, performance and operating risks associated with the upstream production of natural gas at the Producers' wells.[119]  Indeed, oil and gas producers and gathering companies, such as the Producers and Monarch, have operated under this model for decades using similar dedications and related commitments to address the same upstream risks and uncertainties.[120]

Put simply, it would make little sense for Monarch to invest $23 million to purchase gas gathering and salt water disposal systems in the vicinity of the Producers "Dedicated Reserves" if Producers could then simply sell their assets to a third-party free and clear of the GPA and SWDA.  Monarch would be left stranded with capital having little use or value.

### C.    Privity of Estate Exists Between the Monarch and Producers.

The final element under Utah law required for a real covenant to run with the land at law is privity of estate.  While considerable authority for the "abolition" of the privity requirement

---

[119] Dec. of J. Williams, at ¶¶20-22 (Exhibit 2).

[120] Dec. of L. Adair, at ¶19, 21-22 (Exhibit 1).

exists (and it is not even required for a covenant to run with the land in equity),[121] the element is met in this case nonetheless.

Three kinds of privity have been recognized by the court: horizontal, mutual and vertical privity.   Mutual and horizontal privity exists when "the parties have a continuing and simultaneous interest in the same property," and the covenant at issue was created in connection with "a simultaneous conveyance of an estate."[122]   Here, Monarch and Producers share simultaneous interests in the same property, the "Dedicated Reserves," and the natural gas reserve and salt water dedications were made simultaneously in connection with Monarch's purchase of the gathering and salt water disposal systems.

Vertical privity arises "when the person presently claiming the benefit or being subject to the burden, is a successor to the estate of the original person so benefitted or burdened."[123] Wapiti Utah's acquisition of Badlands' assets, including all interests in the "Dedicated Reserves," establishes vertical privity.

Therefore, all privity requirements are met in this case.

## IV.   The Dedications in the GPA and SWDA Constitute Equitable Servitudes.

A covenant will run with the land in equity (commonly known as an equitable servitude) if it touches and concerns the land and the intent element is met.   "Privity of estate is not required, but the successor must have notice of the covenant.[124]   As discussed above, the covenants in the GPA and SWDA touch and concern the land, and the parties otherwise intended

---

[121] *Flying Diamond Oil Corp.*, 776 P.2d at 628.

[122] *Id.* at 628.

[123] *Id*. at 628 and fn. 12.

[124] *Id.* at 623, fn. 6.

for them to run with the land and bind the successors of Gasco Production.  Wapiti Utah also had actual notice of the covenants in the GPA and SWDA; indeed, it sought prior approval from this Court to purchase Badlands' assets free and clear of the contracts.[125]   Therefore, assuming *arguendo* that the dedication covenants do not run with the land in law, they constitute equitable servitudes that would bind Wapiti Utah as Badlands' successor-in-interest.

## V.   Conclusion

The mineral reserve and salt water dedications in the GPA and SWDA meet all legal elements required for a covenant to run with the land as a matter of law and equity.  Accordingly, Badlands' assets cannot be sold to Wapiti Utah "free and clear" of these contractual obligations under Section 363 of the Bankruptcy Code or otherwise.  No genuine issues of material fact exist on these points to preclude judgment as a matter of law in favor of Monarch.

---

[125] R. Doc. No. 18, Action No. 17-17467-KHT.

Dated: February 22, 2018

Respectfully submitted,

Beatty & Wozniak P.C.

/s/ Tyler L. Weidlich
Karen L. Spaulding, #16547
Tyler L. Weidlich, #51706
216 16th Street, Suite 1100
Denver, CO 80202-5115
Phone:  (303) 407-4499
Fax:  (303) 407-4494

kspaulding@bwenergylaw.com
tweidlich@bwenergylaw.com

and

Minor & Brown P.C.

/s/ David M. Rich
David M. Rich, #15211
650 S. Cherry Street, Suite 1100
Denver, CO 80246-1801
Ph: (303) 320-1053
Ph: (303) 376-6020 (Direct)
Fax: (303) 320-6330
drich@minorbrown.com

Attorneys for Monarch Natural Gas, LLC

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 22, 2018, a copy of this **MONARCH NATURAL GAS, LLC'S MOTION FORSUMMARY JUDGMENT AND SUPPORTING MEMORANDUM** was filed and served using the Court's CM/ECF filing system which will send notification to the parties who have entered an appearance, including:

Theodore J. Hartl, Esq.
600 17th Street
Suite 1800 South
Denver, CO 80202
thartl@linquist.com

Kyung S. Lee, Esq.
Charles M. Rubio
Diamond McCarthy LLP
909 Fannin, 37th Floor
Two Houston Center
Houston, TX 77010
klee@diamondmccarthy.com
crubio@diamondmccarthy.com


*/s/ David M. Rich*