# EXHIBIT

# 1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>BADLANDS ENERGY, INC.<br>IN: 98-0204105<br>Debtor. | Case No. 17-17465-KHT<br>Chapter 11 |
| In re:<br><br>BADLANDS PRODUCTION COMPANY<br>EIN: 84-1461816<br>Debtor. | Case No. 17-17467-KHT<br>Chapter 11 |
| In re:<br><br>BADLANDS ENERGY-UTAH, LLC<br>EIN: 47-2023934<br>Debtor. | Case No. 17-17469-KHT<br>Chapter 11 |
| In re:<br><br>MYTON OILFIELD RENTALS, LLC,<br>EIN: 20-1202389<br>Debtor. | Case No. 17-17471-KHT<br>Chapter 11 |
| MONARCH MIDSTREAM, LLC, f/k/a MONARCH NATURAL GAS, LLC<br><br>        Plaintiff,<br>v.<br>BADLANDS PRODUCTION COMPANY, f/k/a GASCO PRODUCTION COMPANY, a Colorado corporation; BADLANDS ENERGY INC., f/k/a GASCO ENERGY, INC., a Colorado corporation; and WAPITI UTAH, L.L.C. f/k/a WATITI NEWCO, L.L.C., a Delaware limited liability company.<br>        Defendants. | **Jointly Administered Under Case No. 17-17465-KHT**<br><br><br>Adversary Proceeding No. _____ |

1                     **EXHIBIT 1**

**AFFIDAVIT OF LESA S. ADAIR IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Lesa S. Adair, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1. I am a founding partner of Pearson Adair & Co ("Pearson Adair"). My business address is 6860 Dallas Parkway, Suite 125, Plano, Texas 75024.

2. I am authorized to submit this affidavit (the "Affidavit") on behalf of MONARCH MIDSTREAM, LLC, ("Monarch") in support of Monarch's Motion for Summary Judgement, to which this Affidavit is annexed.

3. Unless otherwise noted, the statements in this Affidavit are based on: (a) my personal knowledge; (b) my review of the relevant contracts; and (c) my views, based upon my experience in the oil and gas industry. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**PROFESSIONAL BACKGROUND**

4. Pearson Adair provides consulting services to various stakeholders in the energy sector, which services include providing expert testimony and litigation support in energy-related cases, energy asset and company valuation, construction and project development, and mergers and acquisition due diligence.

**EXPERT QUALIFICATION**

5. I have a B.S. in chemical engineering from Oklahoma State University.

6. I have an M.B.A. with a concentration in finance from Southern Methodist University.

7. I am licensed Professional Engineer in the states of Oklahoma and Texas.

8. I am a member of the American Institute of Chemical Engineers and the National Society of Professional Engineers.

9. I have more than 30 years' experience in the oil and gas industry, including as (a) among other things, an engineer and marketing representative at ARCO Oil and Gas Company, (b) CEO, CFO and Director of Muse, Stancil & Co., an oil and gas consulting firm, and (c) a founding partner of Pearson Adair.

10. I have written numerous articles regarding the oil and gas industry, which have been published in, among other publications, the *Oil & Gas Journal* and the *American Oil & Gas Reporter*.

11. I have appeared as an expert witness in twenty-one (21) oil and gas related litigation cases since 2011 in the London Court of International Arbitration, the Supreme Court of South Australia, and in U.S. state and federal courts in California, Delaware, North Dakota, Oklahoma, Pennsylvania, Texas and Utah.

**AFFIDAVIT**

12. The oil and gas industry is made up of three distinct sectors: upstream, midstream, and downstream.

13. Activities in the upstream sector are focused on finding and developing oil and gas reserves through the exploration for, and the production of, oil and gas. The estimated volumes of oil, condensate, natural gas, natural gas liquids ("NGLs") and associated components that are anticipated to be commercially recoverable from known accumulations of unproduced

hydrocarbons are commonly referred to as "reserves."[1] Upstream companies focus on: (i) finding economic oil and gas reserves; (ii) drilling wells to bring oil and gas to the surface; (iii) developing treating and conditioning facilities located close to the wellhead; (iv) operating the wells and associated surface facilities necessary to deliver the oil and gas off the producing lease; (v) managing the disposition of any associated by-products and/or waste streams; and (vi) selling the raw oil and gas at or near the point of the production and/or delivering the products for transport away from the producing lease or field and into midstream facilities.

14.     Gasco Production Company ("Gasco") was an upstream company, and Gasco's successors in interest are upstream companies, that own certain working interests associated with oil and gas leases of private, state, and federal minerals in Uintah and Duchesne Counties, Utah.  These interests are referred to herein as the "Working Interests."  Gasco's Working Interests were acquired through mineral interest leases and drilling/completion of producing wells.  Wells development in the dedicated areas in Duchesne and Uintah counties has been primarily conventional gas production.

15.     The role of participants in the midstream sector is to provide the necessary assets, facilities, pipelines, and services to move raw hydrocarbons from the producing field and deliver crude oil, natural gas, and NGLs to meet the specifications of end users and consumers in downstream markets.  In general, the range of available midstream services includes the following: (i) crude oil gathering and storage; (ii) water gathering and disposal; (iii) gas gathering

---

[1] Petroleum reserves are analyzed, classified and certified by petroleum engineers based on guidelines established by the Society of Petroleum Engineers Oil and Gas Reserves Committee (OGRC).  See Guidelines for Application of Petroleum Resources Management System (PRMS), for example at
http://www.spe.org/industry/docs/PRMS_Guidelines_Nov2011.pdf .

4

and compression; (iv) gas treating; (v) gas processing; (vi) natural gas transmission; (vii) NGL gathering, storage and transmission; (viii) crude oil transmission; and (ix) trucking. Monarch is a midstream company that purchased Gasco's gas gathering and water disposal facilities.

16. Gas wells, such as those operated by Gasco, typically produce gas and water, and may produce light liquid hydrocarbons referred to as "condensate." The gas stream usually contains gaseous hydrocarbons and water vapor, and may contain other inert components as well as contaminants. On-lease, or so-called "field" facilities, are utilized to separate the gaseous components from any associated liquids including water and condensate. Raw natural gas flows away from the producing wellhead in a gaseous state and must, therefore, be captured and transported in a pipeline or gas gathering system. A gas gathering system is typically a series of pipe segments connecting one or more natural gas wells and delivering the collected raw natural gas from the producing field into larger gathering lines serving gas processing facilities or mainline transmission systems.

17. The quality of the water produced in association with oil and gas varies, but associated water usually contains salt and must be disposed of in permitted water injection or evaporation facilities. Depending on the volume of water produced by the wells in a particular producing area, the water may be gathered by pipeline or hauled by truck to the disposal facilities. Midstream providers, such as Monarch, supply the pipeline facilities necessary to transport gas and water away from the producing area. Water is most often delivered to permitted disposal sites located in relatively close geographic proximity to the producing area.

18. The design and configuration of midstream facilities vary significantly throughout the oil and gas industry. Gathering facilities serve the specific needs of the producers in each

unique geographic area. The capacities and design characteristics of the equipment utilized such as pipelines, pumps, compressors, storage tanks, truck loading/unloading, water disposal facilities and gas processing plants are dictated by the relative volumes of oil, gas and by-products being produced, the physical makeup of each produced stream, and the expected production profile or decline curve associated with the producing wells, as well as the disposition specifications for each component in the downstream markets. As such, midstream companies provide "custom" solutions to many upstream producers.

19.     As the link between the upstream and downstream segments of the industry, midstream companies adjust to meet the needs of both the upstream and downstream sectors. Midstream providers control neither the rate of supply development in the upstream sector, nor end-user hydrocarbon demand in the downstream sector. Oil and gas markets are subject to cyclic price behavior driven by factors out of the control of most market participants. Depending on the geographic location of the participants and the markets served, midstream and downstream participants are subject to varying levels of exposure to elasticity of demand and market price risk.

20.     Upstream producers, such as Gasco, enter into agreements with midstream providers, such as Monarch, for oil and natural gas gathering, treating, and conditioning, as well as natural gas processing and related services for by-product gathering and disposition. Under such contracts, producers typically provide a "reserve dedication" in exchange for the midstream companies' financial commitments to provide and operate specific facilities required for oil and gas production. These agreements benefit producers by reducing the initial total capital required to find, develop and produce reserves as midstream providers provide the upfront capital to

6

move produced hydrocarbons and associated by-products and waste streams from the lease and/or producing field. Required financial commitments may include significant capital costs to construct gathering and associated facilities, purchase pre-existing facilities, or purchase and modify existing facilities. Dedication agreements pledge the reserves developed by upstream producers in specific geographic areas, sometimes as limited to certain producing horizons or depths, to a midstream provider providing such services as gathering, treating, conditioning, compression, processing or permitted disposal. Such reserve dedications, which in commercial parlance are sometimes referred to as "acreage dedications," have been used in the oil and gas industry for decades and benefit producers.

21. Reserve dedications are commonly utilized in oil and gas contracts to offset producer performance risk. Typical risks which can impact midstream providers can best be understood by the following hypothetical:

> A gas gatherer contracts with a producer to purchase, and expand if necessary, gathering facilities serving the producer's existing operations and planned development of in a proven gas field. The producer specifies that 50 wells will be drilled in a three-year period and provides the midstream company with expected forecast from existing wells and the prospective well locations, initial well volumes, well producing pressures, and gas component characteristics. The producer represents that the raw gas must flow to third-party gas processing facilities located 10 miles away. The midstream company assumes operations of the existing system, designs the required expansion facilities, borrows a good portion of the funds required for the project, constructs and commissions the gathering facilities necessary to meet the

7

producer's needs based on the representations made. The midstream company invests $175 million within a 12-month period to meet the producer's requirement to monetize the reserves as quickly as possible after drilling and completion.

- <u>Scenario A</u> - Twelve months after startup, the producer has drilled only 20 wells and reports to the midstream company that the wells drilled to date are only half as prolific as had been expected. The producer has reassessed the original 50-well program and will terminate field development at only 25 wells. The expected production profile for the field is now expected to average barely 25 percent (%) of the system capacity and the full life cycle of the project has also been drastically reduced.

- <u>Scenario B</u> - Between the time that the parties execute a formal agreement and system startup, gas prices drop from $4.50 per million British thermal units (MMBtu) to $2/MMBtu. The producer has drilled and completed only 5 wells which are 1.5 times more prolific than the producer had anticipated. Regardless, the midstream company has designed and constructed a system capable of moving the gas produced from 50 less prolific wells and must now operate with only 15 percent of the expected throughput.

- <u>Scenario C</u> - The midstream provider doubles the size of the gathering system with the expectation that other producers will follow suit and begin drilling in the area. Installation of the expanded gathering system assets is completed ahead of schedule allowing the producer to monetize gas reserves several months ahead of the original schedule. After 12 months

of successful operations, the midstream provider approaches the producer to inquire about additional development plans and the potential for system expansion to meet longer-term producer needs. The producer politely informs the midstream provider that all further midstream development would be completed in-house, including the development of a new gas gathering system and processing facility expected to be in service within 18 months.

22. Midstream providers are subject to performance and operating risk due to the interaction with both upstream producers and downstream end users. Dedication agreements have been utilized in the oil and gas industry for decades as a means to offset some of the risk to participants in the midstream sector.

23. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated: February 22, 2018
Plano, Texas

*Lesa S. Adair*

Lesa S. Adair